# FILE
### IN CLERKS OFFICE
### SUPREME COURT, STATE OF WASHINGTON

DATE_____JUN 06 2013

Madsen C.J.

CHIEF JUSTICE

This opinion was filed for record
at 8:00 a.m. on June 6, 2013

Ronald R. Carpenter
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | NO. 86951-1 |
| Respondent, | |
| v. | EN BANC |
| CHRISTOPHER LEON SMITH, | |
| Petitioner. | Filed _____ JUN 06 2013 |

STEPHENS, J.—When officers ran the names in a motel registry to check for warrants, they found an outstanding arrest warrant for motel guest Christopher Smith. As they apprehended Smith at the threshold of his motel room, they saw Quianna Quabner, bloodied and limping, inside the room. Officers entered the room and learned that Quabner and her 12-year-old daughter, L.S., had been assaulted in the hours preceding the officers' arrival; L.S. alleged she had been raped. An immediate investigation ensued, resulting in charges against Smith. Before the case went to trial, however, this court invalidated the practice of random motel registry searches under article I, section 7. *State v. Jorden*, 160 Wn.2d 121, 156 P.3d 893 (2007).

At a suppression hearing, Smith argued that the evidence supporting the charges against him was fruit of the unlawful registry search and must be

suppressed. The trial court allowed the evidence under the inevitable discovery doctrine, which we later invalidated in *State v. Winterstein*, 167 Wn.2d 620, 220 P.3d 1226 (2009). On appeal, the Court of Appeals nonetheless upheld Smith's convictions, concluding the evidence against him was admissible under the attenuation doctrine and the independent source doctrine. The court also rejected Smith's claim that his convictions for first degree rape and second degree rape of a child, arising from his assault against L.S., violate double jeopardy.

We affirm the conviction, though on different grounds than the Court of Appeals. We hold that the evidence presented against Smith was admissible because the warrantless search that led to its discovery was justified under an exception to the warrant requirement for actions by law enforcement when lives are in danger.

## FACTS AND PROCEDURAL HISTORY

On the morning of October 22, 2006, Officer Lee of the Lakewood Police Department stopped by the Golden Lion Motel in Lakewood as part of the Crime Free Motel Program. Clerk's Papers (CP) at 488 (Findings of Fact and Conclusions on Admissibility of Evidence CrR 3.6). A normal practice under the program was to randomly view the guest registry and run the names against the outstanding arrest warrant database. *Id.* Officer Lee got a hit with motel guest Christopher Smith. *Id.* at 489.

Officers went to Smith's room and knocked on the door. He answered and was arrested on the outstanding warrant. During the arrest, while the door was still

open and police were outside the room, they "observed an adult female present in the motel room." *Id.* She was badly injured, sobbing, limping, and bloodied. *Id.* Officers entered the room to render aid. *Id.* They observed the room was in disarray and there were signs of a struggle. They also discovered 12-year-old L.S., Quabner's daughter, and were told that Smith had sexually assaulted L.S. *Id.* Quabner alleged that she had been beaten about the head and body by Smith. *Id.* L.S. told police that items used in the assaults were in a dumpster in the motel parking lot. *Id.* at 490. When police later searched the dumpster they found bags of bloodied clothing and pieces of braided curtain cord consistent with restraints described by the victims. *Id.* A warrantless search of the motel room ensued, as well as interviews with the victims at the motel and later at the hospital.[1]

Smith was charged with rape, assault, harassment, kidnapping, and child rape, with deadly weapon enhancements. Before trial, this court invalidated the practice of random searches of motel registries, holding it violates privacy rights under article I, section 7 of the Washington Constitution. *Jorden*, 160 Wn.2d 121. Smith moved to suppress evidence gathered following the illegal *Jorden* search, including: evidence recovered from the motel room, officer observations of the victims, victim testimony, and evidence recovered from the dumpster. The State conceded that any evidence recovered from the motel room itself should be

---

[1] An additional note about chronology: The attacks in question began late in the night on October 21 and stretched into the early hours of October 22. By Quabner's account, she was exhausted and drained when the attacks ended. She and L.S. fell asleep, and were awakened by the officers' arrival. *See* VII Verbatim Report of Proceedings (Oct. 22, 2008) at 395-96.

excluded because that evidence was recovered without a warrant. II Verbatim Report of Proceedings (VRP) (Oct. 13, 2008) at 152. The State argued that the evidence Smith continued to challenge (officer observations of the victims, victim testimony, and evidence recovered from the dumpster) was exempt from the exclusionary rule under the inevitable discovery doctrine, i.e., because it would have eventually been discovered. The trial court agreed. CP at 492. Smith was tried by a jury and convicted of first degree rape and second degree rape of a child for his assault on L.S., and first degree assault upon Quabner, as well as two counts of first degree kidnapping and two counts of felony harassment.

Following trial, this court invalidated the inevitable discovery doctrine in *Winterstein*, 167 Wn.2d 620. Smith appealed his convictions, arguing that the evidence against him should have been excluded. He also argued that his convictions for first degree rape and second degree child rape, arising from the same act, violate double jeopardy. In response, the State acknowledged that inevitable discovery—the trial court's stated grounds for admitting the evidence tainted by the *Jorden* search—was no longer good law. The State instead urged the Court of Appeals to uphold the admission of the evidence under either the independent source doctrine or the attenuation doctrine. Smith replied that the State had not timely raised the argument and that in any event these doctrines could not save the evidence, in particular because the attenuation doctrine is inconsistent with article I, section 7.

A majority of the Court of Appeals ruled that the evidence against Smith was not fruit of the poisonous tree because it was both independently gained and sufficiently attenuated from the unlawful registry search. Judge David H. Armstrong dissented on this issue, arguing that the court had misapplied the independent source doctrine and agreeing with Smith that the attenuation doctrine is incompatible with article I, section 7 protections. The Court of Appeals rejected Smith's double jeopardy claim.

Smith filed a petition for review, which we granted.

ANALYSIS

Smith makes two distinct and unrelated challenges to his convictions. First, he claims that the evidence presented against him at trial was illegally obtained in violation of his article I, section 7 protections and should have been suppressed. Next, he argues that his convictions for rape violate his constitutional guaranty against double jeopardy. We address each claim in turn.

*A. Article I, Section 7*

The parties agree that this case is not about Fourth Amendment protections, but about article I, section 7 protections. As we have stated many times, article I, section 7 is often more protective than the Fourth Amendment, particularly where warrantless searches are concerned. *See State v. Morse*, 156 Wn.2d 1, 9-10, 123 P.3d 832 (2005). Under our state constitution, warrantless searches are per se unreasonable unless one of the narrow exceptions to the warrant requirement applies. *Winterstein*, 167 Wn.2d at 628.

Here, the Court of Appeals relied on the doctrines of attenuation and independent source in affirming the trial court's decision to deny Smith's suppression motion. The Court of Appeals agreed with the State that "the victims' testimonies were admissible under the independent source exception because the emergency aid and community caretaking exceptions acted as intervening factors." *State v. Smith*, 165 Wn. App. 296, 309, 266 P.3d 250 (2011).

Under the independent source doctrine, an unlawful search does not result in the suppression of evidence ultimately obtained using "a valid warrant or other lawful means independent of the unlawful action." *State v. Gaines,* 154 Wn.2d 711, 718, 116 P.3d 993 (2005). But the lawfully gained information must be genuinely independent of the illegal search. *Id.* at 721 (citing *Murray v. United States*, 487 U.S. 533, 108 S. Ct. 2529, 101 L. Ed. 2d 472 (1988)).

A majority of the Court of Appeals reasoned that "the officers' decision to enter the motel room was based on independent, untainted information because Quabner sought their assistance as community caretakers after the officers had arrested Smith and were preparing to leave." *Smith*, 165 Wn. App. at 311. The need to render aid was a "supervening, intervening factor" triggering the emergency aid exception to the warrant requirement. *Id.* Stated differently, the search that followed was not at all motivated by the illegal *Jorden* search. *See id.*

Judge Armstrong disagreed that the State could rely on the independent source doctrine, noting that "absent the initial, unlawful search of the motel guest registry, the officers had no independent basis for knocking on Smith's door. . . .

Their observations stemmed directly from the initial, illegal search." *Id.* at 331-32 (Armstrong, J., dissenting).

The points in Judge Armstrong's dissent are well taken insofar as the independent source doctrine is concerned. It is impossible to extricate the officers' presence at the motel room threshold and their observation of Quabner from the illegal search the officers performed just prior to arriving at the threshold. Thus, this search cannot be justified by the independent source doctrine.

But the State's argument points to another justification. The State argued before the trial court that the warrantless entry and resulting search was justified by the officers' community caretaking duties and the need to render emergency aid. *See, e.g.,* II VRP (Oct. 13, 2008) at 150. "We may sustain a lower court's judgment upon any theory established by the pleadings and supported by the proof." *Mountain Park Homeowners Ass'n v. Tydings,* 125 Wn.2d 337, 344, 883 P.2d 1383 (1994). Although the State filtered the import of the officers' emergency aid function through the lens of exceptions to the exclusionary rule, it clearly argued that the officers' duty to render emergency aid was a central justification for the officers' actions and built a record supporting that assertion. We therefore consider this alternative theory.

The undisputed facts of this case make it clear that a warrantless, limited intrusion into the motel room was justified by the emergency exception to the warrant requirement, also known as the "save life" exception, a subset of the community caretaking exception to the warrant requirement. *See State v. Acrey,*

148 Wn.2d 738, 748, 64 P.3d 594 (2003) (describing emergency aid and routine checks on health and safety as instances of community caretaking). Washington courts have held on many occasions that law enforcement may make a warrantless search of a residence if (1) it has a reasonable belief that assistance is immediately required to protect life or property, (2) the search is not primarily motivated by an intent to arrest and seize evidence, and (3) there is probable cause to associate the emergency with the place to be searched. 12 ROYCE A. FERGUSON, JR., WASHINGTON PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 2734, at 649-51 (3d ed. 2004) (collecting cases analyzing warrantless searches under the "save life" exception); *State v. Stevenson*, 55 Wn. App. 725, 780 P.2d 873 (1989), *review denied*, 113 Wn.2d 1040, 785 P.2d 827 (1990). Notably absent from this standard is a requirement that the officer's initial presence be justified, in contrast to many other exceptions to the warrant requirement, including a plain view search. *State v. Hatchie*, 161 Wn.2d 390, 395, 166 P.3d 698 (2007) (explaining that a plain view search occurs when officers have a legitimate reason to be in an otherwise protected area).[2]

---

[2] Justice Chambers' dissent complains that under this rule, the search here fails under the first element because "the officers were not reviewing the motel registry or knocking on that motel door because they believed someone likely needed assistance." Dissent at 4. We do not apply the emergency aid exception to a point in time preceding the knowledge that emergency aid was necessary. Certainly, the officers here knocked on the door as a result of an illegal search, motivated by an intent to arrest. But once the door was open, they entered the motel room in order to render emergency aid to Quabner, and the evidence gathered thereafter was a consequence of that justified entry. The dissent also appears to take issue with our use of the phrase "save life exception." Dissent at 4-5. We use this phrasing in the context of our already-recognized emergency aid doctrine to highlight the factual predicate of this very narrow exception.

When we bear in mind the relevant standard, it was reasonable for the officers to believe that immediate assistance was required to protect life after they observed the badly injured Quabner inside the motel room. The search was not motivated by any investigatory purpose, as the trial court made an undisputed finding that the "police entered the motel room to render aid to [Quabner] and to ensure the safety of any other occupants in the motel room and to secure any weapons." CP at 489. There is no question that probable cause existed to associate the emergency with the place to be searched. Consequently, on this record, we have no trouble concluding that the emergency aid or "save life" exception applied to this warrantless search.[3]

As to the scope of such a search, the admissible evidence is limited to that which was in plain view when officers entered to perform their emergency aid function. *Stevenson*, 55 Wn. App. at 729-30; *State v. Lynd*, 54 Wn. App. 18, 19-

---

[3] The "save life" exception to the warrant requirement in this context does not function much differently from the Court of Appeals' independent source rule analysis. But for the sake of analytical clarity, we think it better to ground the justification for this search in a warrant exception, rather than in a nullification of the exclusionary rule. Because the "save life" exception to the warrant requirement does not require that an officer's initial presence be legitimate, when the officers here crossed the motel door threshold to render emergency aid, their actions were not tainted by the illegality stemming from the *Jorden* search. The Court of Appeals was correct insofar as it described the observations of Quabner as "intervening circumstances" justifying the entry and a limited search of the motel room, *Smith*, 165 Wn. App. at 311, but tying such a justification to the independent source rule is problematic for the reasons Judge Armstrong identified in his dissent. Such an expansive view of the independent source rule could readily lead to mischief where, for example, a plain view observation of drugs following an illegal search becomes an independent source justifying an exception to the exclusionary rule. Our decision today, however, acknowledges that an independent justification for the warrantless search exists under the "save life" exception, a very limited and specific exception that recognizes law enforcement must be able to respond to crimes against persons and prosecute those crimes.

-9-

23, 771 P.2d 770 (1989) (evidence plainly observed after officer dispatched to respond to "911 hang-up" and entered home under emergency aid exception not suppressed); *State v. Raines*, 55 Wn. App. 459, 461, 464-65, 778 P.2d 538 (1989) (evidence recovered after officers dispatched to respond to report of domestic dispute and entered home under emergency aid exception not suppressed). In *Stevenson*, officers received information that a murder had been committed at the defendant's home. *Stevenson*, 55 Wn. App. at 728. Upon arrival at the home, an officer could see a body through a window. *Id.* When backup arrived, officers entered the home and discovered a grisly crime scene with multiple murders. *Id.* Officers first swept the home to check for victims who might yet need medical aid, noting numerous evidentiary items in plain view such as pools of blood and signs of a struggle. *Id.* Having confirmed that all the victims were dead and no immediate threat was present, the responding officers waited outside for additional members of their investigative unit to arrive. *Id.* The team set about collecting evidence over the next several hours without first securing a warrant. *Id.* The defendant moved to suppress the recovered evidence, arguing that once the emergency created by the discovery of a crime scene ended, additional evidence should have been secured by warrant. *Id.* at 729.

The Court of Appeals in *Stevenson* disagreed. It held that any fruit of the search that was in plain view need not be excluded. *Id.* at 729-30. It further held that "[t]he second entry [of the investigative team] followed hard on the heels of the initial sweep and was nothing more than a continuation of the prior lawful

search." *Id.* at 731. The Court of Appeals cautioned, however, that the second search could not exceed the scope of the earlier legitimate intrusion and that any evidence recovered that was not in plain view must be suppressed. *Id.* at 732.

Here, the question is whether the evidence used at trial and challenged by Smith—i.e., officer observations of the victims, victim testimony, and evidence recovered from the dumpster—was admissible as a result of the "save life" exception. We hold that it was. Officer observations of the victims were part of the plain view sweep of the motel room following entry to render aid. Discovery of the victims was also part of the officers' plain view observations, and hence the testimony at trial of the victims was not tainted by any illegality.

As to the evidence recovered in the dumpster, the record indicates that L.S. volunteered this information contemporaneously with the officers' efforts to render aid and ascertain the nature and extent of the victims' injuries. That is, officers did not learn of the evidence in the dumpster in the course of their investigation into the incident but as part of performing their caretaking function. *See* CP at 490 (findings of fact suggest that officers learned of the evidence in the dumpster in the course of rendering aid, before calling for medical assistance); I VRP (Oct. 9, 2008) at 57-58, 110, 120 (officer testimony indicating that responding officers, not investigating officers, learned of the dumpster evidence in the minutes before the ambulance arrived).

The victims' testimony was also properly admitted at trial. We are dubious of Smith's claim that Quabner's and L.S.'s testimony can be characterized as

"fruit" of the search. As the Court of Appeals observed, it is reasonable to assume that as victims of Smith's acts, these witnesses would be willing to testify. *Smith*, 165 Wn. App. at 315. And, there is a constitutional dimension to the right of crime victims to participate in criminal proceedings. *See* WASH. CONST. art. I, § 35. Moreover, there is no indication in the record that the search of the motel room, which we conclude was valid under the "save life" exception to the warrant requirement, had any effect on the victims' testimony.

In sum, the evidence admitted at Smith's trial was legally obtained under the "save life" exception to the warrant requirement. We affirm Smith's conviction.[4]

*B. Double Jeopardy*

Smith argues that his convictions violate double jeopardy because he was convicted of both first degree rape and second degree rape of a child arising from the same assault against L.S.

We review claims of double jeopardy de novo. *State v. Hughes*, 166 Wn.2d 675, 681, 212 P.3d 558 (2009). Both the federal and state constitutions prohibit a person from being punished twice for the same offense, although "[w]ithin constitutional constraints" the legislature is free to define crimes and punishments as it sees fit. *State v. Calle*, 125 Wn.2d 769, 776, 888 P.2d 155 (1995).

> To analyze a double jeopardy claim, we first examine the statutory language to see if the applicable statutes expressly permit punishment for the same act or transaction. If the statutes do not speak to multiple punishments for the same act, we next apply the "same evidence" analysis.

---

[4] Having affirmed the conviction for the reasons articulated here, we need not consider the State's attenuation doctrine argument, including the State's request that we reconsider *State v. Afana*, 169 Wn.2d 169, 233 P.3d 879 (2010).

> Even if the two statutes pass the same evidence inquiry, multiple convictions may not stand if the legislature has otherwise clearly indicated its intent that the same conduct or transaction will not be punished under both statutes.

*Hughes*, 166 Wn.2d at 681-82 (footnote omitted). As *Hughes* notes, this test is variously called the "'same evidence test'" or the "'*Blockburger* test.'" *Id.* at 682 n.6 (citing *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932)).

The Court of Appeals held that Smith's rape convictions do not violate double jeopardy because while the crimes are the same in fact, they are not the same in law. *Smith*, 165 Wn. App. at 320. The Court of Appeals reasoned that first degree rape requires proof of forcible compulsion and use of a deadly weapon, while second degree rape of a child requires proof only of the victim's status based on age and marriage. *Id.*

Smith argues that several cases from this court and the Court of Appeals instruct that a force-based sex offense cannot be punished as a separate crime from a status-based sex offense. *See* Suppl. Br. of Pet'r at 30-32 (citing *State v. Birgen*, 33 Wn. App. 1, 2, 651 P.2d 240 (1982) (suggesting that a conviction for third degree rape and statutory rape in the third degree would violate double jeopardy if not for the fact that the defendant was given concurrent sentences, which under the law at the time negated any double jeopardy problem); *State v. Elswood*, 15 Wash. 453, 454, 46 P. 727 (1896) (accepting without comment a forcible rape and statutory rape charged as a single crime); *State v. Roller*, 30 Wash. 692, 696-97, 71 P. 718 (1903) (explaining that rape of a child presumes force); *State v. Adams*, 41

Wash. 552, 553, 83 P. 1108 (1906) (same as *Roller*); *State v. Dye*, 81 Wash. 388, 389-90, 142 P. 873 (1914) (holding that an acquittal on child rape precluded a subsequent prosecution for forcible rape based on the same act)).

Notably, among the cases Smith relies upon is *State v. Allen*, 128 Wash. 217, 222 P. 502 (1924). Smith describes *Allen* as holding that an "allegation of forcible rape against [a] 13-year-old charges a single crime." Suppl. Br. of Pet'r at 32. While this is an accurate summary of *Allen* so far as it goes, there is more. While recognizing only a single rape charge, the court in *Allen* observed:

> It is at once apparent, of course, that the provisions of the one section of the statute overlap the provisions of the other—that is to say, a single act may be a rape by force and a rape because of the age of the victim of the offense—but this circumstance does not prohibit a prosecution founded on either section of the statute. There is no such direct conflict that the one impliedly repeals the other, and in such cases the prosecuting officer has the right of election to proceed under either.

128 Wash. at 219. As we later recognized, the *Allen* court said nothing about whether the prosecutor could have, alternatively, elected to proceed under both sections. *See State v. Powers*, 152 Wash. 155, 160, 277 P. 377 (1929) (explaining that the *Allen* court did not intend to suggest that the prosecutor must elect between the two crimes). Likewise, it is not entirely clear that *Powers* treats forcible rape and statutory rape as the same crime for the purposes of double jeopardy. There we observed that "[t]he crime of rape by force and the crime of rape because of the age of the victim, are defined, it is true, in separate sections of the statute, but this does not make a single act which is violative of both sections, separate crimes." *Id.* We further explained that "[t]he pleader may charge the offense as a rape by

force and as a rape because of age, and if he proves either or both, he satisfies the statute and the defendant may be convicted." *Id.* It is not quite clear what we meant by "the statute." These cases reveal that we have not been entirely consistent in explaining our view of the propriety of convicting a defendant for both a force-based sexual assault and an age-based sexual assault. But, we do not read *Allen* and *Powers* as supporting Smith's view.

More recently, we considered the imposition of multiple convictions for sex crimes arising from the same act in *Calle*, 125 Wn.2d 769 and *Hughes*, 166 Wn.2d 675. In *Calle*, the defendant was convicted of first degree incest and second degree rape for the same act of intercourse with his minor stepdaughter. *Calle*, 125 Wn.2d at 771-72. This court held that the convictions did not violate double jeopardy, reasoning that the crimes were not the same under the *Blockburger* test because "[i]ncest requires proof of relationship" whereas rape "requires proof of force." *Id.* at 778. In *Hughes*, the defendant sexually assaulted a 12-year-old child with cerebral palsy. He was convicted of second degree rape based on the subsection dealing with the victim's inability to consent due to physical helplessness or mental incapacity and second degree child rape. *Hughes*, 166 Wn.2d at 679. The court reasoned that both crimes "require proof of nonconsent because of the victim's status." *Id.* at 684. Under the *Blockburger* test, we held that "the two offenses are the same in fact and law" and double jeopardy barred a conviction on separate offense. *Id.* at 683-84.

Distinguishing *Hughes*, the Court of Appeals here explained that the sex offenses in question were not the same in law because one crime requires proof of force with use of a deadly weapon, while the other requires proof of the victim's status based on age. *Smith*, 165 Wn. App. at 320. Likewise, the Court of Appeals reasoned that *Calle* supported its decision in that it found no double jeopardy violation where the crimes required proof of different elements. *Id.* at 322.

The Court of Appeals' reasoning is sound. The elements of first degree rape and second degree rape are dissimilar enough to satisfy the *Blockburger* test. However, we must acknowledge that, as Smith notes, both *Hughes* and *Calle* spoke favorably of *Birgen*. Suppl. Br. of Pet'r at 30-31 (citing *Calle*, 125 Wn.2d at 775, 779-80 (discussing *Birgen*) and *Hughes*, 166 Wn.2d at 685-86 (same)). And, as Smith notes, the Court of Appeals here did not acknowledge *Birgen* at all.

*Birgen* makes categorical statements about double jeopardy and the sex-based offenses at issue here.

> We conclude that the Legislature has not authorized multiple rape convictions arising out of a single act of sexual intercourse violating more than one of the statutory sections defining rape and statutory rape. The history of the rape statutes shows legislative intent and judicial recognition that both the rape and the statutory rape statutes define a single crime of rape with the degree of punishment dependent on the underlying circumstances.

*Birgen*, 33 Wn. App. at 14. *Birgen* recognized that the *Blockburger* test resolved the question before it in the State's favor.

> The State is correct that under the "same evidence" test of *State v. Roybal*, 82 Wn.2d 577, 512 P.2d 718 (1973) and *Blockburger v. United States*, 284 U.S. 299, 76 L. Ed. 306, 52 S. Ct. 180 (1932), rape in the third degree and statutory rape in the third degree would not be the "same

offense." The *Blockburger* test, however, is merely one means of determining legislative intent.

*Id.* at 7. Because the *Blockburger* test favored multiple convictions, the *Birgen* court conducted its own analysis of legislative intent, which it concluded counseled against adherence to the *Blockburger* test and in favor of finding a double jeopardy violation. *Id.* at 8-14.

We have made it clear on more than one occasion that the *Blockburger* test is a rule of statutory construction applied to discern legislative intent in the absence of *clear* indications to treat one act as constituting separate crimes. *See Calle*, 125 Wn.2d at 778; *State v. Kier*, 164 Wn.2d 798, 804, 194 P.3d 212 (2008); *State v. Kelley*, 168 Wn.2d 72, 77, 226 P.3d 773 (2010). The Court of Appeals in *Birgen* seemingly overlooked this admonition. The legislative history identified by the Court of Appeals in *Birgen* is insufficient to negate the *Blockburger* test and compel its conclusion that the legislature clearly intended to treat crimes of rape based on use of deadly force and crimes of rape involving status as the same crime for the purpose of double jeopardy. For this reason, we must now disapprove of *Birgen*.[5]

As for the other cases cited by *Smith* (and, for that matter, *Birgen*), all can be distinguished. Assuming that *Roller* and *Adams* are correct that rape of a child presupposes force, child rape laws do not require force by deadly weapon, as does

---

[5] While the court in *Hughes* spoke favorably of *Birgen*'s recitation of the legislative history, *Hughes*, 166 Wn.2d at 685-86, *Hughes*'s reliance on *Birgen* was dicta because *Hughes*, using the *Blockburger* test, found a double jeopardy violation. It was therefore unnecessary to search the legislative history for indications that the legislature intended the crimes be punished separately. *Id.* at 681-82.

the first degree rape charge here.[6] And these cases, as well as *Dye*, 81 Wash. 388, predate *Blockburger* by several years.

In sum, while the case law has not been entirely consistent, *Calle* is a close analogue here. Adopting the Court of Appeals' analysis of double jeopardy under the *Blockburger* test, we conclude Smith suffered no double jeopardy when he was convicted of first degree rape and second degree rape of a child.

CONCLUSION

The evidence admitted at Smith's trial was lawfully obtained under the "emergency aid" or "save life" exception to the search warrant requirement. Smith was not placed in double jeopardy when he was convicted of first degree rape and second degree rape of a child. Accordingly, we affirm his convictions.

---

[6] Moreover, the entire discussion of force seems arcane. Certainly, consent is sometimes relevant and the law presumes a child to be incapable of consent. But, in modern jurisprudence regarding sex crimes, force is no longer the touchstone for evaluating a claim of sexual assault. *See, e.g.,* RCW 9A.44.060(1)(a) (rape in the third degree) (criminalizing sexual intercourse under circumstances not involving force (i.e., first and second degree rape), but where the victim did not consent). In this regard, *Roller* and *Adams* may represent an antiquated view of our understanding of sexual assault.

Stephens, J.

WE CONCUR:

Johnson, J.

Wiggins, J.

Owens, J.

No. 86951-1

MADSEN, C.J. (concurring in the result)—I concur in the result reached by the lead opinion and the concurrence. I write separately, however, because these opinions expand or adopt warrant exceptions that I believe are inconsistent with article I, section 7 of the Washington Constitution. Instead, I would hold that the initial motel registry search was legal and overrule *State v. Jorden*, 160 Wn.2d 121, 156 P.3d 893 (2007).

Discussion

Article I, section 7 states that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." CONST. art. I, § 7. We have stated that these privacy protections apply more broadly than those under the Fourth Amendment to the United States Constitution. *State v. Ladson*, 138 Wn.2d 343, 348, 979 P.2d 833 (1999). Although we have acknowledged "a few 'jealously and carefully drawn exceptions' to the warrant requirement," the lead opinion and the concurrence would expand these exceptions beyond what has been recognized under our constitution. *State v. Reichenbach*, 153 Wn.2d 126, 131, 101 P.3d 80 (2004) (internal quotation marks omitted) (quoting *State v. Hendrickson*, 129 Wn.2d 61, 72, 917 P.2d 563 (1996)).

I have several concerns about the approaches taken by the lead opinion and the concurrence based on our prior decisions. First, the lead opinion expands the community

caretaking doctrine. Historically, we have applied this doctrine only in instances where an officer's initial presence was based on a belief that someone needed aid or assistance. *See, e.g., Kalmas v. Wagner*, 133 Wn.2d 210, 217, 943 P.2d 1369 (1997) (petitioners called 911 asking for police assistance and invited a deputy into a residence); *State v. Lawson*, 135 Wn. App. 430, 435, 144 P.3d 377 (2006) (deputies responded to an anonymous call reporting a strong chemical odor coming from a residence); *State v. Menz*, 75 Wn. App. 351, 354, 880 P.2d 48 (1994) (officers responded to a report of domestic violence and discovered the front door open, lights and TV on, and received no response to their knocks). However, in this case the only reason the police were at Christopher Smith's door is because of the "search" of the motel registry. The lead opinion does not cite any case where this court has applied the community caretaking doctrine when the officer's initial presence is so tainted. I hesitate to apply this doctrine here because it will seriously undermine the protections of article I, section 7.

The concurrence's use of the attenuation doctrine is equally concerning because we have not explicitly adopted it under article I, section 7. *State v. Eserjose*, 171 Wn.2d 907, 919, 259 P.3d 172 (2011). Further, this doctrine requires a balancing of factors, including speculation of the witness' free will to testify and the deterrent effect of the exclusionary rule. We have stated that "the balancing of interests should not be carried out when evidence is obtained in violation of a defendant's constitutional rights." *State v. Winterstein*, 167 Wn.2d 620, 632-33, 220 P.3d 1226 (2009) (quoting *State v. Bonds*, 98 Wn.2d 1, 10-11, 653 P.2d 1024 (1982)). In *Winterstein*, we compared the independent

2

source and inevitable discovery doctrines and recognized that the independent source doctrine does not rely on any balancing of interests prior to the exclusion of unlawfully obtained evidence. *Id.* at 634. In contrast, the inevitable discovery doctrine, which *Winterstein* rejected, requires speculation and fails to adequately protect privacy rights. *Id.* The same concerns in *Winterstein* are present with the attenuation doctrine, which relies on speculation and a balancing of factors before excluding evidence. It is inconsistent with our analysis in *Winterstein* to adopt the attenuation doctrine while rejecting the inevitable discovery doctrine when both implicate similar article I, section 7 interests.

Further, this court has previously suggested that the testimony of a witness discovered through an illegal search is not admissible unless knowledge of the witness is gained through an independent source. *State v. O'Bremski*, 70 Wn.2d 425, 428-30, 423 P.2d 530 (1967) (noting that several courts have held the testimony of a witness discovered as a result of an illegal search is not admissible, but determining that the witness there could testify because knowledge of her came from an independent source). Here, the evidence was not lawfully obtained by a source independent of the unlawful action, and so the independent source doctrine does not apply. We should not now adopt the attenuation doctrine to reach a desired result, when case law suggests otherwise.

Instead, we should reconsider whether the search was illegal in the first place. I believe our decision in *Jorden* was wrong and harmful, as I articulated in my dissent. *Jorden*, 160 Wn.2d at 135-40 (Madsen, J., dissenting). As a result, it is unsurprising that

a case such as this could arise. Indeed, the resulting search by police was of the very type *Jorden* was intended to prevent and which the lead opinion now seeks to validate. *Jorden* should be overruled. Accordingly, it is unnecessary to engage in an analysis of warrant exceptions under the exclusionary rule.

As Justice Chambers notes, the facts in this case are reprehensible. However, we should not expand the well settled exceptions to the warrant requirement in order to reach a desirable result. I would overrule *Jorden* and uphold the Court of Appeals' decision on the basis that the initial motel registry search was legal.

No. 86951-1
Madsen, C.J. (concurring in result)

Madsen, C. J.

No. 86951-1

GONZÁLEZ, J. (concurring in result)—I concur with the lead opinion that the trial judge properly admitted the testimony of the victims in this case, albeit on incorrect grounds. Victims have a right to be found, to be seen, and to be heard. I recognize this court has shown some recent reluctance to adopt the attenuation doctrine. In my view, when the allegedly tainted evidence is the testimony of a person, especially the victim of the crime, we should follow the path set down by the United States Supreme Court in *United States v. Ceccolini*, 435 U.S. 268, 276, 98 S. Ct. 1054, 55 L. Ed. 2d 268 (1978). Under *Ceccolini*, there is no per se rule barring a witness's testimony, especially a victim's testimony, merely because an officer broke the rules in finding that victim. Instead, we consider whether the witness was freely willing to testify, whether there was a great likelihood that the witness would have been discovered by legal means, and whether excluding the witness's testimony would have any deterrent effect on the officer's improper conduct. 435 U.S. at 276-79. My review of the record persuades me that Quianna Quabner and her daughter were willing to testify, that their existence would have been soon discovered, and that excluding their testimony would have no cognizable impact on deterring any improper

searches. Similarly, I would not prohibit the officers from testifying about what they saw in that motel room. The victims were willing to testify; it is highly likely they would have been found; and, in the wake of *State v. Jorden*, 160 Wn.2d 121, 156 P.3d 893 (2007), excluding their testimony to prevent warrantless review of motel registries would be, at best, a quixotic exercise.

As our state constitution explicitly recognizes, victims have rights too. CONST. art. I, § 35. In my view, among those rights is the right to testify against their attackers. There may be remarkable cases where some other constitutional principle would exclude a victim from freely testifying, but like Chief Justice Burger, I have difficulty imagining what one might be. *Ceccolini*, 435 U.S. at 280 (Burger, C.J., concurring). Courts should not suppress people or treat them like the fruit of the poisonous tree. They deserve better.

I agree with the lead opinion that double jeopardy was not violated by the entry of convictions of first degree rape and second degree rape of a child. I see no need, however, to consider whether the community caretaking exception to the warrant requirement should be expanded to cover this situation. I respectfully concur in result.

González, J.

Fairhurst, J.

3

*State v. Smith (Chris)*

No. 86951-1

CHAMBERS, J.* (dissenting)—The facts before us are reprehensible. The lead opinion's quest to find or create an exception to article I, section 7 of the Washington Constitution that would allow a court to consider the illegally seized evidence is understandable. Nonetheless, I must respectfully dissent. Properly understood, this is nothing more than an inevitable discovery case, and the inevitable discovery doctrine does not allow what our state constitution forbids. *State v. Winterstein*, 167 Wn.2d 620, 636, 220 P.3d 1226 (2009). Under our state constitution, officers of the law must have actual authority of the law to intrude into private affairs, even the affairs of bad men.

It is of great concern to me that the community caretaking exception to the warrant requirement has begun to take a drunken weave through our jurisprudence. As used by the lead opinion in this case, the community caretaking exception is a cure for this warrantless search. I am also concerned that the lead opinion resolves this case on a legal theory not argued at trial or meaningfully developed on appeal, substantially relying on a "save life" exception never before articulated in our case law (or, as far as I can tell, in any state's case law). It may be that this evidence was admissible under some permissible permutation of the community caretaking

*Justice Tom Chambers is serving as a justice pro tempore of the Supreme Court pursuant to Washington Constitution article IV, section 2(a).

doctrine, but that doctrine was only mentioned in passing below. We have no meaningful record or argument before us upon which to consider the issue. Similarly, this is not an attenuated evidence case. Perhaps it could have been, if the attenuated evidence exception was compatible with our constitution, and if it had been so argued at trial. If it had been so argued, facts would have been developed and court findings made on temporal proximity, intervening circumstances, the purpose and flagrancy of the official misconduct, and all the other issues that might play into our analysis.

Instead, in the wake of *State v. Jorden*, 160 Wn.2d 121, 156 P.3d 893 (2007), the State argued that the evidence it found by randomly and illegally reviewing motel registries was admissible under the inevitable discovery doctrine, with the community caretaking doctrine only playing a supporting role after the allegedly inevitable 911 call from the victim that would have led to a police response. *Winterstein* was almost a year from publication, and the trial court accepted the State's since-rejected theory.

EXCEPTIONS TO THE WARRANT REQUIREMENT MUST BE CAREFULLY DRAWN

Our constitution is clear. "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." CONST. art. I, § 7. Generally, warrants provide this authority of law required by our constitution. *State v. Morse*, 156 Wn.2d 1, 7, 123 P.3d 832 (2005) (citing *State v. Ladson*, 138 Wn.2d 343, 350, 979 P.2d 833 (1999)). "Exceptions to the warrant requirement are to be 'jealously and carefully drawn'" to prevent the exceptions from swallowing the constitutional

2

rule. *Id.* (internal quotation marks omitted) (quoting *State v. Reichenbach*, 153 Wn.2d 126, 131, 101 P.3d 80 (2004)); *State v. Tibbles*, 169 Wn.2d 364, 372, 236 P.3d 885 (2010).

COMMUNITY CARETAKING EXCEPTION

One such exception to the warrant requirement is the community caretaking function. This court has never specifically considered the allowable contours of the community caretaking exception under article I, section 7. However, as we stressed in *State v. Kinzy*, 141 Wn.2d 373, 385, 5 P.3d 668 (2000), this exception arises from the exercise of "'[l]ocal police officers['] . . . *community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.*'" *Id.* (quoting *Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S. Ct. 2523, 37 L. Ed. 2d 706 (1973)). Over the years, "Washington cases have expanded the community caretaking function exception to encompass not only the 'search and seizure' of automobiles, but also situations involving either emergency aid or routine checks on health and safety." *Id.* at 386 (footnote omitted) (citing *State v. Loewen*, 97 Wn.2d 562, 567-68, 647 P.2d 489 (1982); *State v. Villarreal*, 97 Wn. App. 636, 643-44, 984 P.2d 1064 (1999)). It may be that article I, section 7 could tolerate an extension of the emergency aid exception that would encompass the search here. However, I cannot agree with the lead opinion that, as currently articulated, the exception applies here. The emergency aid exception

3

applies when "(1) the officer subjectively believed that someone
likely needed assistance for health or safety reasons; (2) a reasonable
person in the same situation would similarly believe that there was a
need for assistance; and (3) there was a reasonable basis to associate
the need for assistance with the place searched."

*Id.* at 386-87 (quoting *State v. Menz*, 75 Wn. App. 351, 354, 880 P.2d 48 (1994)).

As articulated, this search fails on the first element; the officers were not reviewing

the motel registry or knocking on that motel door because they believed someone

likely needed assistance. If the requirement that the officers *not* be seeking

evidence of a crime is not clear from the first element itself, it is clearly a threshold

requirement under *Kinzy* and *Cady. Kinzy,* 141 Wn.2d at 385 (quoting *Cady,* 413

U.S. at 441).

The lead opinion skirts our case law by drawing our attention to a Court of

Appeals opinion that did not analyze article I, section 7, and *Washington Practice,*

asserting that "[n]otably absent from this standard is a requirement that the

officer's initial presence be justified." Lead opinion at 8 (citing 12 ROYCE A.

FERGUSON, JR., WASHINGTON PRACTICE: CRIMINAL PRACTICE AND PROCEDURE §

2734, at 649-51 (3d ed. 2004); *State v. Stevenson*, 55 Wn. App. 725, 780 P.2d 873

(1989)). That may be true as articulated in *Washington Practice.* But the cases

from this court that have considered the issue deeply have stressed that the

exception arises *only* where the officers were not looking for evidence of a crime.

*E.g., State v. Acrey,* 148 Wn.2d 738, 749, 64 P.3d 594 (2003); *Kinzy,* 141 Wn.2d at

385 (quoting *Cady,* 413 U.S. at 441). And no case I can find in this state or any

4

other establishes the existence of the "'save life' exception" relied upon by the lead opinion. Lead opinion at 8. Of course, state agents have the power and duty to save and protect lives when they can. That is not the question before us. The question is whether the evidence they seize along the way is admissible in court.

In *Jorden,* we found the very program at issue here, the city of Lakewood's random inspection of hotel registries, at the very same Golden Lion Motel, violated article I, section 7. Again, under our constitution, "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." CONST. art. I, § 7. We reasoned:

> Our most important inquiry then becomes whether a random and suspicionless search of a guest registry reveals intimate details of one's life. We first consider that here there is more information at stake than simply a guest's registration information: an individual's very presence in a motel or hotel may in itself be a sensitive piece of information. There are a variety of lawful reasons why an individual may not wish to reveal his or her presence at a motel. As the amicus American Civil Liberties Union (ACLU) points out, couples engaging in extramarital affairs may not wish to share their presence at the hotel with others, just as a closeted same-sex couple forced to meet at the motel also would not. Br. of ACLU at 11. The desire for privacy may extend to business people engaged in confidential negotiations, *id.,* or celebrities seeking respite from life in the public eye. One could also imagine a scenario, as Jorden's trial attorney pointed out during the motion to suppress, where a domestic violence victim flees to a hotel in hopes of remaining hidden from an abuser.

*Jorden,* 160 Wn.2d at 129. We concluded:

5

Therefore, the information contained in a motel registry—including one's whereabouts at the motel—is a private affair under our state constitution, and a government trespass into such information is a search. We hesitate to allow a search of a citizen's private affairs where the government cannot express at least an individualized or particularized suspicion about the search subject or present a valid exception to a warrantless search.

*Id.* at 130. *Jorden* clearly applies to this search. The search lacked authority of law. Its fruits must not come into court.

ATTENUATION DOCTRINE

Nor do I believe the attenuation doctrine saves the fruits of this illegal search, as the lead opinion implicitly (and the concurrence explicitly) suggests. Under the Fourth Amendment, "evidence obtained by illegal means may nonetheless be admissible if the connection between the evidence and the illegal means is sufficiently attenuated or remote. [ ] This is an exception to the fruit-of-the-poisonous-tree doctrine." BLACK'S LAW DICTIONARY 146-47 (9th ed. 2009); *see also State v. Eserjose,* 171 Wn.2d 907, 920-21, 259 P.3d 172 (2011) (quoting *Wong Sun v. United States,* 371 U.S. 471, 487-88, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963)). Because the attenuation doctrine was not argued at trial, no foundation was laid. If, after examining the motel registry, the police heard cries for help from the parking lot or just outside the door, this might also have been an appropriate case to examine the attenuation doctrine. But under the undisputed facts of this case, the only reason the police were at the door of Christopher Leon

Smith's motel room was because of the illegal search of the motel registry. Even if the doctrine were to apply, it would not save this search.

This court has never adopted the attenuation doctrine and, in my view, it has no place under article I, section 7. I recognize the issue has badly split this court. In *Eserjose,* three justices gave their unqualified signatures to an opinion adopting it; four justices, including this dissenting justice, lent their unqualified signatures to an opinion rejecting it. *See* 171 Wn.2d at 929 (Alexander, J., lead opinion), 940 (C. Johnson, J., dissenting).

If we were to adopt the attenuation doctrine, *Eserjose* would have been a poor case to do it. Upon receiving a tip that Eserjose and a housemate might have been responsible for a burglary, two officers were dispatched to Eserjose's father's home, where all three men lived. *Id.* at 909-10. Eserjose's father let the officers into the house but did not give them permission to go up the stairs to the bedroom area. The police officers disregarded the father's limited permission to be in his home, went up the stairs, and arrested both suspects. This violated *Payton v. New York,* 445 U.S. 573, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980). *Eserjose,* 171 Wn.2d at 910, 912. Eserjose was taken to the police station and, after being advised of his *Miranda*[1] rights and being told his accomplice had implicated him, confessed to the crime. *Eserjose,* 171 Wn.2d at 911. Heavily relying on a factually similar federal constitutional case, the lead opinion found the attenuation doctrine rehabilitated Eserjose's otherwise-tainted confession. *Id.* at 917-18 (citing

---

[1]*Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

*New York v. Harris,* 495 U.S. 14, 110 S. Ct. 1640, 109 L. Ed. 2d 13 (1990)). The lead opinion concluded that "the proper inquiry is whether the confession is 'sufficiently an act of free will to purge the primary taint'" and found under the facts it was. *Id.* at 918-19 (internal quotation marks omitted) (quoting *Brown v. Illinois,* 422 U.S. 590, 602, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975)). One justice signed this opinion in result only. Writing separately, the chief justice concluded under the facts, there was no cause to apply the attenuation doctrine at all because, in her judgment, the confession was not the fruit of the illegal arrest. Instead, the confession was "connected to his learning of his accomplice's confession, and not to any illegality associated with the deputies' exceeding the scope of consent to enter the home. This should end the analysis." *Eserjose,* 171 Wn.2d at 931 (Madsen, C.J., concurring). A vigorous dissent signed by four justices rejected the proposition that "time, intervening circumstances, or less egregious misconduct can infuse the fruits of an illegal seizure with the authority of law required by article I, section 7" and concluded that "[e]vidence obtained in violation of a person's constitutional rights, even if attenuated, still lacks the authority of law and should be suppressed." *Id.* at 940 (C. Johnson, J., dissenting). Whatever else can be said about *Eserjose,* we did not use it to adopt the attenuation doctrine.

INDEPENDENT SOURCE DOCTRINE

I do agree with the lead opinion that the Court of Appeals improperly relied upon the independent source doctrine. The independent source doctrine is a viable exception to article I, section 7. *See State v. Gaines,* 154 Wn.2d 711, 116 P.3d 993

8

(2005). However, it requires that the State acquire the evidence "pursuant to a valid warrant or other lawful means independent of the unlawful action." *Id.* at 718. The independent source doctrine demands an *actual,* not hypothetical or imaginary, independent source. In this case, the evidence was not obtained lawfully by some second set of officers unconnected with the unlawful random search of the motel registry. There was no independent source.

INEVITABLE DISCOVERY DOCTRINE

The trial court relied on the inevitable discovery doctrine. And indeed, if the federal inevitable discovery doctrine were compatible with article I, section 7, this evidence might have been properly admitted. But the federal inevitable discovery doctrine "allows admission of illegally obtained evidence." *Winterstein,* 167 Wn.2d at 634 (citing *Nix v. Williams,* 467 U.S. 431, 444, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984)). This "is at odds with the plain language of article I, section 7, which we have emphasized guarantees privacy rights with no express limitations." *Id.* at 635 (citing *Ladson,* 138 Wn.2d at 348).

The lead opinion suggests those things in plain view of the officers were admissible. At the very least, "[u]nder the plain view doctrine, an officer must: (1) have a prior justification for the intrusion; (2) inadvertently discover the incriminating evidence; and (3) immediately recognize the item as contraband." *State v. Myers,* 117 Wn.2d 332, 346, 815 P.2d 761 (1991) (citing *State v. Kennedy,* 107 Wn.2d 1, 13, 726 P.2d 445 (1986)). But police must not improperly put

9

themselves into a position to make a plain view observation, *id.,* which, again, is what happened here.

Because much of the evidence relied upon was unconstitutionally seized, I would reverse Smith's conviction. I respectfully dissent.

*State v. Smith,* No. 86951-1
Chambers, J., dissenting

Chambers, JPT