IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 77987-7-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| v. | ) | |
| | ) | PUBLISHED OPINION |
| MATTHEW ALEX HARRIS, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | FILED: July 22, 2019 |

HAZELRIGG-HERNANDEZ, J. — The community caretaking exception permits law enforcement officers to invade an individual's privacy when the officers have a reasonable, objective belief that the person requires assistance. Officers searched the vehicle Matthew Harris occupied after discovering him and the driver sleeping inside. The officers knew there was an opioid crisis in the community, but had no other basis to conclude an emergency existed as to these two individuals. Generalized suspicions based on community-wide concerns are insufficient to justify an invasion of privacy. Reversed and remanded.

FACTS

In the middle of the day in December 2016, a civilian flagged down Kent Police Department Officers Ferguson and Birkhofer. The civilian said there were two people passed out in a car and asked the officers to check on them. The officers found the driver and the defendant, Matthew Harris, either asleep or unconscious. The officers offered conflicting testimony regarding how long they

observed the occupants of the vehicle before making contact. Both officers testified that they looked through the window and observed that the occupants were not awake. The occupants were slumped over in their seats and, based on their training and experience, the officers suspected the occupants had used heroin. The officers initiated contact because of concerns that the occupants had potentially overdosed on heroin. The officers did not observe anything else inside the vehicle that suggested drug use or any other crime. Before contacting the occupants of the vehicle, the officers did not make any attempt to rouse them. The officers opened the doors to the vehicle and woke up the occupants. After they opened the doors, the officers observed drug paraphernalia consistent with the use of heroin.

The officers arrested Harris for possession of drug paraphernalia. Based on evidence found during and subsequent to the arrest, Harris was later charged with and convicted of possession of stolen property, identity theft, and making a false statement to a public servant.

## DISCUSSION

I.  The community caretaking tests under Kinzy and Smith are essentially the same

Warrantless searches are per se unreasonable unless one of the narrow exceptions to the warrant requirement applies. State v. Kinzy, 141 Wn.2d 373, 384, 5 P.3d 668 (2000). The State bears the burden of showing a warrantless search falls within one of the exceptions. Id.

The community caretaking exception to the warrant requirement encompasses both situations requiring emergency aid and routine checks on health and safety. Id. at 386. Whether a community caretaking encounter is reasonable depends on balancing the individual's privacy interest against the public's interest in having the police perform the caretaking function. Id. at 387. Circumstances requiring emergency aid involve greater urgency and justify a greater intrusion. Id. at 386. But the court must cautiously apply the community caretaking exception when weighing the public's interest, because of "'a real risk of abuse in allowing even well-intentioned stops to assist.'" Id. at 388, (quoting State v. DeArman, 54 Wn. App. 621, 626, 774 P.2d 1247 (1989)).

Until State v. Smith, Washington had a clear test for evaluating whether the community caretaking exception applied. 177 Wn.2d 533, 303 P.3d 1047 (2013). Previous cases had consistently articulated a three part test adopted by our Supreme Court in Kinzy. Under Kinzy, the exception applies "when[:] '(1) the officer subjectively believed that someone likely needed assistance for health or safety reasons; (2) a reasonable person in the same situation would similarly believe that there was a need for assistance; and (3) there was a reasonable basis to associate the need for assistance with the place searched.'" 141 Wn.2d at 386-87. In State v. Schulz, our Supreme Court codified three additional factors: (4) an imminent threat of substantial injury to persons or property; (5) a belief that specific persons or property were in need of immediate help for health or safety reasons;

and (6) that the claimed emergency is not a mere pretext for an evidentiary search. 170 Wn. 2d 746, 754, 248 P.3d 484 (2011).[1]

In Smith, the plurality of a divided court appeared to rely on a "save life" exception as a subset of the community caretaking exception. 177 Wn.2d at 541. The test articulated by the Smith plurality requires that: (1) the officer has a reasonable belief that assistance is immediately required to protect life or property; (2) the search is not primarily motivated by an intent to arrest and seize evidence; and (3) the officer has probable cause to associate the emergency with the place to be searched. 177 Wn.2d at 541 (citing 12 ROYCE A. FERGUSON, JR., WASHINGTON PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 2734, at 649–51 (3d ed. 2004) (collecting cases analyzing warrantless searches under the "save life" exception)).

We recently addressed the community caretaking exception in State v. Boisselle. 3 Wn. App. 2d. 266, 415 P.3d 621, review granted, 191 Wn.2d 1004 (2018). In Boiselle, we applied both the Smith and Kinzy tests and determined that the result would be the same in either case. Id. at 280 and 286. Upon further consideration, we hold that it is unnecessary to apply the test twice.

The two formulations apply essentially the same test. The first two factors of the Kinzy test, the officer's subjective belief of the need for assistance, and that a reasonable personal would also believe there was a need for assistance, coupled with the fourth and fifth factors added by Schulz, requiring an immediate threat to a specific person or property, are roughly equivalent to the first factor of the Smith

---

[1] These three factors appear to have been implicit in Kinzy to some degree. 141 Wn.2d at 385 (Community caretaking functions are totally divorced from investigative functions) and 386 (the emergency aid function involves circumstances of greater urgency).

test, that the officer has a reasonable belief that assistance is immediately required. The second factor in the Smith test, that the search is not primarily motivated by an intent to arrest or seek evidence, matches the sixth factor added by Schultz. The third factor in each test, the basis to associate the need for assistance with the place being searched, appears to arise out of language from the same case, State v. Nichols. See State v. Lynd, 54 Wn. App. 18, 21, 771 P.2d 770 (1989) (citing Nichols, 20 Wn. App. at 466).

Whichever formulation of the test we apply, Harris argues only that there was no reasonable, objective belief that he was specifically in need of immediate assistance.

II.    There was no reasonable, objective basis to believe Harris was

specifically in need of immediate assistance

On appeal from a suppression hearing, conclusions of law are reviewed de novo and unchallenged findings of fact are accepted as true. State v. Gaines, 154 Wn.2d 711, 716, 116 P.3d 993 (2005). At oral argument, the parties agreed that the trial court's conclusion that the officers had an objective, reasonable basis to believe that Harris was in need of immediate assistance was a question for us to review de novo. We agree.

A.    Suspected unconsciousness alone does not support a reasonable,

objective belief of a need for immediate assistance

Harris does not challenge the trial court's findings of fact. We therefore consider the following facts as verities: a concerned citizen had flagged down the officers to check on the occupants of the vehicle, the vehicle was in a public parking

lot, the occupants were sleeping or unconscious and slumped in their seats, it was midday, and there was an opioid epidemic in the community at large. Harris argues that those facts are insufficient to establish a reasonable objective belief that he was in need of immediate assistance. State v. Hos illustrates why he is correct. 154 Wn. App. 238, 225 P.3d 389 (2010).

In Hos, law enforcement accompanied a CPS caseworker to the defendant's residence. Id. at 242. The officer knocked loudly on the defendant's door, but received no response. Id. The officer looked through a window near the front door and saw the defendant sitting on the couch with her eyes closed and her head resting on her chest. Id. The officer could not tell if the defendant was breathing. Id. After the officer pounded on the door again, he saw that the defendant had not moved or responded. Id. The officer opened the unlocked front door and entered the defendant's house. Id. After remaining in the defendant's house, the officer observed some drug paraphernalia on the defendant's person. Id. at 242-43. At trial, both the officer and the caseworker expressed their concern for the defendant's health. Id. at 243. On appeal, the defendant argued that the officer did not use the least intrusive means to execute his community caretaking function. Id. at 248. The court held that officers were not required to use the least intrusive means, and that the paraphernalia were admissible under the community caretaking exception. Id. 249.

The facts known to the officer in Hos are very similar to the facts here. The defendant in Hos was sitting on a couch, unconscious, during hours when people are usually awake. Similarly, Harris was sitting in a car, unconscious or asleep,

6

during hours when people are usually awake. While those are not the usual locations or times for people to sleep, neither are those locations and times outlandish. Those facts, without more, do not give rise to a reasonable belief that the person needs immediate assistance.

The officer in Hos had one crucial fact that the officers here lacked: the defendant in Hos was unresponsive. A person that fails to wake up or respond to attempts to rouse them would cause a reasonable, objective person to believe that intervention was necessary. We recognize the need for officers to act quickly when there is a reasonable basis to believe that they have encountered an emergency. But that need must be balanced against the privacy interests each of us holds. It is not unreasonable to expect law enforcement to take at least some minimum step to identify a specific basis to support their belief that the person whose privacy interests are at issue needs emergency assistance.

Here, the officers had a reasonable, objective basis to contact Harris as a routine health and safety check, and inquire if he needed assistance. But because the officers could not distinguish whether Harris was unconscious or asleep, and no other facts suggested an emergency situation, the officers lacked a reasonable, objective basis to justify an intrusion into the vehicle. We note that the officers here took enough time to observe the inside of the vehicle such that they were able to later testify as to the position of the occupants and describe items located inside the vehicle. Knocking on the window during their visual sweep of the scene would not have meaningfully slowed down the officers' response if this had actually been an emergency situation. Without verifying that Harris and the other passenger

7

were unresponsive, general community concerns and otherwise neutral facts were insufficient to justify a warrantless intrusion.

The State argues that the officers had additional facts supporting a reasonable, objective belief that this was an emergency, but we do not find them compelling. While a concerned citizen asked the officers to check on the vehicle, they offered no additional information that suggested the situation was an emergency. The general existence of an opioid epidemic in the community is likewise unavailing. While we appreciate the dangers of opioids, the existence of drugs in the greater community could not help the officers determine whether this particular situation was an emergency. Furthermore, the existence of drugs is not new and not likely to change. A general knowledge that drugs are available in the community cannot justify invading the privacy of sleeping individuals.

The State also argues that the location of the car, in a busy parking lot during the middle of the day, was another indication that Harris or his companion were in need of assistance. We note that in each of the last three annual point in time counts of King County's homeless population, more than 2,000 individuals were living in their cars. APPLIED SURVEY RESEARCH, COUNT US IN 8, (2019). While a busy parking lot and the middle of the day may seem like a strange place to sleep, for individuals facing homelessness, sleeping during the day in a public place may provide a modicum of safety that might not otherwise be available. Just as probably, citizens may be found sleeping in their car during daylight hours because they are napping over a lunch break, or are in the midst of long distance travel and are catching up on rest after driving through the night. The mere fact of

a person sleeping in a car during the day, without any accompanying observations of a possible medical issue or drug use, would not lead a reasonable person to believe that an emergency existed.

Some additional details consistent with suspected drug overdose could satisfy the emergency aid exception, such as observations about unusual breathing patterns, skin appearance (e.g. extreme pallor, lesions or wounds consistent with intravenous drug abuse), evidence of vomiting or other physical irregularities. But merely being asleep or unconscious while slumped down in a parked car at midday, even in a community with an opioid epidemic, is inadequate to justify an officer opening a car door without first briefly attempting to speak to or otherwise rouse the suspected overdose victim.

Because the limited facts available to law enforcement did not support a reasonable objective belief that Harris or his companion required immediate assistance at the time the officers invaded his privacy, we reverse Harris's conviction, grant his motion to suppress evidence gathered from the unlawful search of the vehicle, and remand to the trial court for further proceedings.

We reverse and remand.

WE CONCUR: