IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 31894-0-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DEXTER JOHN BUSH, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

FEARING, J. — Dexter Bush sexually enslaved his adopted daughter, Fawn. A jury convicted Bush of one count of rape in the first degree, five counts of rape in the second degree, one count of assault in the second degree, two counts of intimidating a witness, and one count of felony harassment, all with domestic violence as an aggravating factor. The jury also found sexual motivation for the second degree assault and witness intimidation charges.

Dexter Bush appeals, contending: (1) his two convictions for witness intimidation violated the prohibition against double jeopardy, (2) evidence presented at trial was insufficient to prove felony harassment, (3) evidence was insufficient to prove the second degree assault and witness intimidation offenses were committed with sexual motivation, and (4) the trial court did not have authority to order a mental health evaluation as a condition of community custody. We affirm all convictions and the sexual motivation sentencing enhancements. We vacate the requirement that Bush undergo a mental health evaluation as a condition of community custody.

## FACTS

Dexter Bush began dating Fawn's mother when Fawn was five years old. He married the mother several years later. Bush legally adopted Fawn when she was 12 years old at a time the family lived in Montana. Because of the violent and coercive nature of the sexual activity, we reluctantly refer to the contact between Dexter Bush and Fawn as "sex." Nevertheless, Bush began having sex with Fawn just before the adoption became final.

Fawn's mother suffered from health problems. She often napped during the day. She wore earplugs when she napped and slept at night. The first rape occurred while Fawn's mother was asleep. Bush then held a serrated knife to Fawn's lip, told her to keep quiet, and ordered her not to tell anyone of his conduct or he would kill her. Dexter Bush had sex with his adoptive daughter almost every day thereafter, and he made

2

multiple, repeated threats to kill Fawn and drive from town to town to kill family members while she watched, if she told.

When Fawn was 14 years old, she started to tell her mother about the abuse, but Bush entered the room where the mother and daughter conversed. When Fawn's mother exited the room, Bush struck Fawn in the arm, grabbed her by the neck, and told her not to try tattling again. On one occasion after Fawn returned from a sleepover at a friend's house, Bush strapped Fawn to a chair and attached electrodes from an electrical stimulation machine to her nipples and genitals. He interrogated her as to whether she told anyone about the abuse.

Fawn Bush lived in terror and tried to kill herself several times. Fawn became pregnant with Dexter Bush's child when she was 15 years old. Bush told her he intentionally impregnated her because of her frequent suicide attempts and his belief that, if she bore a child, her efforts to end her life would cease.

Dexter Bush continued to molest Fawn after the birth of their son, Jared. Bush's threats changed to killing Jared in front of Fawn or to having her declared an unfit mother, and then raising Jared "to be just like him." Report of Proceedings (RP) at 93. During sex, Bush slapped Fawn when she cried.

When drinking in the company of others, Dexter Bush occasionally punched Fawn in the arms and legs, ridiculed her if she cried, and laughed about his violence as being horseplay. In the presence of company on one occasion, Bush's scraping of Fawn's leg

3

caused bleeding, after which he told the company he was "just playing." RP at 95. If Fawn protested or physically defended herself when Bush hit Fawn, Bush punished Fawn after company left. Bush owned many knives and always wore one, usually the knife he called "pig sticker." RP at 95. Once when alone, Bush pinned Fawn to the couch, held her eyelid open, and lowered a lit cigarette to within an inch of her eyeball.

Fawn Bush and her family moved to Sandpoint, Idaho, when Fawn was eighteen. Fawn's mother and Dexter Bush separated soon thereafter, and Bush dated Cheena, a woman from Goldendale who was the same age as Fawn. Bush and Cheena married and had a child. Bush continued to sexually attack Fawn.

In June or July 2009, Fawn, Jared, Dexter Bush, Cheena, and the new arrival moved to Goldendale. A year later the group moved into a motor home at a trailer park. Occasionally, Dexter Bush took Fawn to an empty motor home across the field from their trailer and raped her. Bush owned the empty motor home.

The State of Washington could not charge Dexter Bush for most of the rapes because many occurred in another jurisdiction and charges for most assaults were time barred. The State nonetheless introduced evidence of the many sexual assaults beginning when Fawn was twelve years of age, in order to show the intimidation Fawn underwent at the time of the rapes for which Bush was charged and to counter Bush's defense that all sexual acts were consensual. We now outline the sexual batteries that comprise the

4

charges against Bush. Understandably, Fawn could not recall exact dates for rapes, but testified to a date range for each incident.

*Count One: Rape in the first degree*

On July 4, 2010, Fawn Bush started a dating relationship that lasted three months. This new relationship infuriated Dexter Bush. Bush warned Fawn that her boyfriend could not protect Jared and her, and he cautioned her again to remain silent about his conduct. Bush also instructed Fawn not to have sex with the boyfriend.

One day, between July 15 and August 15, 2010, Bush escorted Fawn to the empty motor home, ordered her to undress, and, when she cried and protested, battered her on the head with an empty beer bottle, knocking her unconscious. When Fawn gained consciousness, Bush dragged her up stairs and forcibly entered her anus. Bush had anally raped Fawn before, but this rape was the worst. Fawn bled for several days.

*Count Two: Rape in the second degree*

One day, between June 15 and July 31, 2010, Dexter Bush told Fawn to undress. She cried and begged him not to have sex with her. Bush punched Fawn in the eye, leaving a bruise that lasted for days. He told her the thump was a warning that she must not complain but should "tune out" his conduct as she had before. Bush then vaginally entered Fawn.

*Count Three: Rape in the second degree*

5

Fawn Bush engaged in sex with her boyfriend. When Dexter Bush learned of this activity, he told Fawn he would continue to have anal sex with her since she would not willingly perform this act with her boyfriend. One day in August 2010, Bush fulfilled the threat. During the assault in the empty motor home, Bush told Fawn to remain silent and to continue living with him. Bush threatened the safety of Fawn and Jared.

*Count Four: Rape in the second degree*

Dexter and Cheena Bush separated many times. During one of these splits and between September 1 and November 15, 2010, Bush and Fawn occupied their trailer, while Jared slept in a compartment over the driver seat. Bush enjoined Fawn to perform oral sex on him. After some fellatio, Bush vaginally entered Fawn. Fawn did not remonstrate on this occasion, and later testified her lack of protest resulted from a fear that Jared would awaken. Bush warned that if Jared awakened, events would turn tragic.

*Count Five: Rape in the second degree*

Because the Bushes' motor home lacked a shower, Fawn bathed at the public pay showers at the trailer park. She often avoided showers because Bush followed her inside if no one else used the showers. Once in January 2011, Bush told Fawn she must shower, followed her to the public shower, and, after Fawn told him no one else was present, forced her to have vaginal sex in a shower stall.

*Count Six: Rape in the second degree*

6

Dexter Bush last sexually assaulted Fawn on February 9, 2011. Fawn recalls the date because the attack occurred two days before Fawn stabbed Bush in the neck. On February 9, Bush again threatened to kill Jared or take him away, and again forcibly entered her vagina in the nearby empty motor home.

*Count Seven: Assault in the second degree*

Fawn Bush testified that between July 15 and August 15, 2010, Dexter Bush punched her in the eye socket so violently she thought the assault broke a bone. Fawn heard a snap when Bush struck her face. Bush was drunk. Fawn's face swelled for two weeks, and her boss at a restaurant told her that he would fire her if she appeared at work again with a black eye. Fawn, as instructed by Bush, told the boss she received the bruise while breaking up a fight between Bush and someone else. Despite the pain, Fawn never sought medical attention for fear she would be asked questions as to the cause of the swollen eye.

*Count Eight: Intimidating a witness*

In August 2010, Dexter Bush insisted to Fawn that their sexual relationship continue. He claimed he would prove her an unfit mother and wrest Jared from her if she sought to leave him. Fawn testified at trial that she took what Dexter said seriously.

*Count Nine: Intimidating a witness*

Fawn Bush missed a menstrual period between September 1, 2010, and December 31, 2010. Dexter Bush then told her to engage in sex with her boyfriend so others would

7

conclude that the boyfriend impregnated her. Bush also told Fawn he would kill her if she was pregnant because the world could not endure another child looking like him.

*Count Ten: Felony harassment*

Dexter Bush threatened one summer day in 2010 to kill Fawn. Fawn had spent considerable time with her boyfriend. Bush repeatedly asked Fawn if she had mentioned his conduct to another. On this occasion, Bush, while seated around friends, told Fawn that he, "without ever blinking an eye," could kill her, Jared, and Cheena. RP at 127. At trial, Fawn testified that she considered the threat serious since Bush had never threatened, in the presence of others, to kill her "without a problem." RP at 128. Fawn explained that others do not threaten, in front of third persons, to kill a loved one.

*Fawn Bush Stabs Dexter Bush*

On February 11, 2011, Dexter Bush drunkenly assaulted Fawn and Cheena. He slammed Cheena's head into a mirror as she held their infant son. Jared narrowly dodged objects Bush threw about the fifteen-foot motor home. As Bush screamed he would chop everyone into little pieces, Fawn grabbed a knife and stabbed him in the neck.

The State of Washington charged Fawn Bush with first degree assault. During the pendency of her prosecution, Fawn withheld from law enforcement, a Child Protection Services (CPS) caseworker, and her defense counsel, Bush's sexual and physical assaults. Fawn would rather have served time in jail than face the consequences of Bush learning she had disclosed his behavior.

8

In January 2012, Fawn Bush pled guilty to third degree assault and served jail time. After her release and on February 24, 2012, Fawn told the couple caring for Jared that Bush raped and abused her. She did not realize that one of her confidantes was a mandatory reporter. When she realized that law enforcement was being notified, she panicked. Her CPS caseworker arranged an emergency appointment with a therapist.

Goldendale police arrested Dexter Bush on February 25, 2012. At trial, Police Seargent Jay Hunziker testified that, after he told Fawn that Bush had been arrested, Fawn grew more frightened than during a previous night's interview.

On May 7, 2012, the State moved for, and was granted, withdrawal of Fawn Bush's guilty plea to third degree assault.

## PROCEDURE

On February 27, 2012, the State of Washington charged Dexter Bush with one count of first degree rape, five counts of second degree rape, two counts of intimidating a witness, one count of second degree assault, and one count of felony harassment. A jury trial was held on June 3, 5, and 6, 2013. Before Fawn Bush's trial testimony, the trial court granted the State permission to question Fawn about each charged incident by directing her to the time frame charged, rather than Fawn relating exact dates for each charge. The court denied the State's request to give Fawn a copy of the charging document to consult during her testimony.

9

During trial, Dexter Bush admitted he had sex with Fawn when she was 15 years old and fathered her child, Jared. He conceded the sexual contact equated to bad judgment on his part, but insisted that Fawn consented. Bush admitted that he did not want anyone to know he fathered Jared, that he avoided placing his name on Jared's birth certificate, and that he assisted Fawn in sham attempts to identify the father to Montana authorities. Bush acknowledged that he and Fawn continued a sexual relationship over the years, but he insisted that the relationship remained consensual. Bush also denied ever uttering threats to Fawn.

Dexter Bush protested to the jury that Fawn alleged sexual abuse as part of a strategy to regain parental control of Jared, since CPS took temporary custody of the boy after she stabbed Bush. Bush criticized Fawn as a bad mother, in part because she chose "partying" over Jared.

On June 6, 2013, a jury convicted Dexter Bush of all charged offenses. For each offense, the jury found an aggravating factor of domestic violence coupled with a pattern of abuse. The jury also ruled the assault and two counts of intimidating a witness were sexually motivated.

The Department of Corrections (DOC) filed a presentence investigation report on July 5, 2013. The report, based on information given by Dexter Bush, read that Bush began seeing mental health counselors when he was approximately ten years of age, and he spent time in a mental institution in Warm Springs, Montana. Bush claimed to have

been diagnosed with anger problems, bi-polar disorder, and schizophrenia. He ceased taking Risperdal in jail, because the medication rendered him vulnerable to attacks and he needed to feel anger to protect himself. Bush also reported suffering from many alcohol induced blackouts. Based on its presentence investigation, DOC recommended 524 months of confinement and conditions of supervision that included a psychosexual evaluation with treatment recommended by DOC or a treatment provider.

At sentencing, the trial court calculated Dexter Bush's standard range sentence for first degree rape to be 240-318 months. The court calculated the standard range for second degree rape to be 210-280 months. Based on the aggravating domestic violence found by the jury and Bush's high offender score due to the number of counts, the court imposed an exceptional sentence consisting of 582 months. The trial court thereby imposed the high end for first degree rape of 318 months, concurrent with most of the other offenses, but consecutive to a 210 month sentence for one of the second degree rape convictions, plus 54 months for sentencing enhancements. The court also imposed, as a condition of community custody, that Bush undergo a mental health evaluation.

LAW AND ANALYSIS

Issue 1: Whether the two witness intimidation convictions violate the prohibition against double jeopardy?

Answer 1: No.

11

Dexter Bush contends that his two convictions for intimidating a witness violate the Fifth Amendment's prohibition against double jeopardy. He argues that when he committed the acts of intimidation in 2010, the statute under which he was eventually convicted, RCW 9A.72.110, did not count each act as a separate offense. Accordingly, he forwards the concept of "unit of prosecution" and argues that the unit of prosecution for witness intimidation should be a course of conduct rather than discrete threats of intimidation. We disagree and affirm both convictions.

Both the federal and state constitutions prohibit a person from being punished twice for the same offense, although within constitutional constraints the legislature is free to define crimes and punishments as it sees fit. *State v. Smith*, 177 Wn.2d 533, 545, 303 P.3d 1047 (2013); *State v. Calle*, 125 Wn.2d 769, 776, 888 P.2d 155 (1995). Washington's double jeopardy clause offers the same protection as the federal constitution. *State v. Womac*, 160 Wn.2d 643, 650, 160 P.3d 40 (2007).

Dexter Bush does not argue that the legislature could not, if it wished, criminalize two distinct acts of intimidation within a course of continuing threats. He argues the relevant statute, however, only imposes one crime upon him for his ongoing intimidation. His argument is more one of statutory construction than constitutional application. When a defendant is convicted of multiple violations of the same statute, the double jeopardy question focuses on what "unit of prosecution" the legislature intends as the punishable act under the statute. *State v. Westling*, 145 Wn.2d 607, 610, 40 P.3d 669 (2002).

12

Whether or not a defendant faces multiple convictions for the same crime can rest on the unit of prosecution. *State v. Hall*, 168 Wn.2d 726, 730, 230 P.3d 1048 (2010). A unit of prosecution can be either an act or a course of conduct. *Hall*, 168 Wn.2d at 731. If the legislature fails to define the unit of prosecution or its intent is unclear, under the rule of lenity any ambiguity must be resolved against turning a single transaction into multiple offenses. *Hall*, 168 Wn.2d at 730. The unit of prosecution rule is designed to protect the accused from overzealous prosecution. *State v. Turner*, 102 Wn. App. 202, 210, 6 P.3d 1226 (2000). When conducting a unit of prosecution analysis for the purpose of double jeopardy:

> the first step is to analyze the statute in question. Next, we review the statute's history. Finally, we perform a factual analysis as to the unit of prosecution because even where the legislature has expressed its view on the unit of prosecution, the facts in a particular case may reveal more than one "unit of prosecution" is present.

*State v. Hall*, 168 Wn.2d at 730; (quoting *State v. Varnell*, 162 Wn.2d 165, 168, 170 P.3d 24 (2007)). We thus peruse the 2010 version of the witness intimidation statute.

In 2010, RCW 9A.72.110, Washington's statute criminalizing witness intimidation provided, in relevant part:

> (1) A person is guilty of intimidating *a witness* if a person, *by use of a threat* against *a current or prospective witness*, attempts to:
> (a) Influence the testimony of that person;
> (b) Induce that person to elude legal process summoning him or her to testify;
> (c) Induce that person to absent himself or herself from such proceedings; *or*

(d) Induce that person not to report the information relevant to a criminal investigation or the abuse or neglect of a minor child, not to have the crime or the abuse or neglect of a minor child prosecuted, or not to give truthful or complete information relevant to a criminal investigation or the abuse or neglect of a minor child.

. . . .

(3) As used in this section:

(a) "*Threat*" means:

(i) To communicate, directly or indirectly, the intent immediately to use force against any person who is present at the time; or

(ii) Threat as defined in RCW 9A.04.110(2[7]).

(b) "Current or prospective witness" means:

(i) A person endorsed as a witness in an official proceeding;

(ii) A person whom the actor believes may be called as a witness in any official proceeding; or

(iii) A person whom the actor has reason to believe may have information relevant to a criminal investigation or the abuse or neglect of a minor child.

(Emphasis added.) In 2011, the legislature amended RCW 9A.72.110 to clarify the number of charges that may be brought for intimidating a witness: "For purposes of this section, each instance of an attempt to intimidate a witness constitutes a separate offense." LAWS OF 2011, ch. 165, § 2 (effective July 22, 2011).

Prior to the 2011 amendment, Washington courts provided little help in clarifying what constituted a unit of prosecution under RCW 9A.72.110 for double jeopardy purposes. In *State v. Marko*, 107 Wn. App. 215, 220-21, 27 P.3d 228 (2001), the question of whether threats constituted a continuing course of conduct arose under different circumstances and in a different legal context. The defendant, who robbed a gas station, argued his threats over the course of 90 minutes against two gas station owners

14

who overpowered and subdued him constituted two or more discrete threats such that he was entitled to a unanimity instruction. This court disagreed.

*State v. Meneses*, 149 Wn. App. 707, 714-15, 205 P.3d 916 (2009), *aff'd*, 169 Wn.2d 586, 238 P.3d 495 (2010), also addressed RCW 9A.72.110 in another context. This court held that one threatening phone call supported convictions for both intimidating a witness and criminal harassment, without violating double jeopardy principles. In other words, the defendant was charged under two statutes. Neither *Marko* nor *Menses* answers the question of what constituted a unit of prosecution under RCW 9A.72.110 in 2010.

Our Supreme Court provided guidance in *State v. Hall*, 168 Wn.2d 726 at 730. The court held that the unit of prosecution for witness tampering, under RCW 9A.72.120, was "the ongoing attempt to persuade a witness not to testify in a proceeding," rather than each individual instance of tampering. *Hall*, 168 Wn.2d at 734. Isiah Hall's girlfriend agreed to testify against him on charges of burglary and assault. While in jail, Hall tried to call her over 1,200 times and attempted to convince her not to testify or testify falsely because his arrests were her fault. A jury eventually convicted Hall of three counts of witness tampering, but the Supreme Court reversed after conducting a unit of prosecution analysis, holding "that the legislature intended to criminalize inducing 'a' witness not to testify or to testify falsely." *Hall*, 168 Wn.2d at 737. Because Hall attempted to tamper with only one witness, he could be convicted of only one count.

15

*Hall* is helpful, but this court must conduct its own analysis with regard to RCW 9A.72.110 to determine whether Dexter Bush's two convictions for intimidating Fawn not to report his abuse violated the prohibition against double jeopardy. As explained below, the wording of RCW 9A.72.110 compels a ruling that double jeopardy does not bar affirming Bush's two convictions.

The witness tampering statute at issue in *Hall* differed from the witness intimidation statute at issue in this case in one crucial aspect: the requirement that a threat accompany the attempt to intimidate. *See* RCW 9A.72.110(1); *State v. Fuentes*, 150 Wn. App. 444, 451, 208 P.3d 1196 (2009). In contrast with RCW 9A.72.120, the language of the 2010 version of RCW 9A.72.110 criminalizes "a threat." Use of the indefinite article "a" connotes certain instances of particular or individualized threats. Therefore the unit of prosecution can be based on each threat, rather than each witness. Witness tampering, under RCW 9A.72.120, only criminalizes the inchoate crime of attempting to induce a witness not to testify or to testify falsely. The statute reads, in relevant part: "(1) A person is guilty of tampering with *a witness* if he or she *attempts to induce a witness . . .* to: (a) Testify falsely or . . . withhold any testimony." (Emphasis added.)

A controlling decision is *State v. Ose*, 156 Wn.2d 140, 146-48, 124 P.3d 635 (2005). In *Ose*, the Supreme Court focused on the legislature's choice of the indefinite article "a" in RCW 9A.56.160(1)(c), which render possessing "a stolen access device" a criminal offense. The court reasoned that because the word "a" is used to precede a

singular noun, the legislature's use of the word "a" gave RCW 9A.56.160(1)(c) the plain meaning that possession of each stolen access device is a separate violation of the statute.

We reviewed the legislative history behind RCW 9A.72.110 and found the history of no help in resolving Dexter Bush's contention. Therefore, we turn to the final step in the unit of prosecution analysis: the facts of Dexter Bush's case. Bush urges this court to hold, as the Supreme Court did in *Hall*, that his two convictions for witness intimidation violate the prohibition against double jeopardy because his course of conduct was continuous and ongoing, and it was aimed at the same person in an attempt to persuade her not to disclose the alleged abuse. The State counters that the two counts of witness intimidation did not concern the same criminal investigation, nor even the same jurisdiction. The State argues that count eight concerned a threat not to disclose one of the instances of rape to Fawn Bush's new boyfriend, while the threat alleged in count nine was made in an attempt to conceal Jared Bush's paternity, for which Dexter Bush could have been prosecuted in Montana for statutory rape. We agree with the State.

On the one hand, Fawn Bush testified that, in August 2010, Dexter Bush threatened to have her declared an unfit mother if she reported, to her new boyfriend, any abuse she suffered from Bush. On the other hand, Fawn testified that his threat to kill her, uttered between September and December 2010, related to her possibly being pregnant with another child and the desire to conceal his paternity for another child. Bush admitted that he and Fawn agreed that she would not identify him to Montana

17

No.31894-0-III
*State v. Bush*

authorities as Jared's father. This evidence would allow a jury to conclude that the two threats, although related to Bush's ongoing intention to keep Fawn from reporting any abuse, concerned different charges and proceedings. The August 2010 threat related to abuse alleged by Fawn in Washington State. The September-December 2010 threat related to Dexter's attempts to conceal Jared's paternity as to avoid statutory rape and incest charges in Montana. Montana's statute of limitations for statutory rape prosecutions is ten years from the date the alleged victim reaches the age of 18 years old. MONT. CODE. ANN. § 45-1-205(1)(b); MONT. CODE ANN. § 45-5-502. Therefore, in 2010, a separate proceeding in Montana was and is still possible.

Based on the language of RCW 9A.72.110 and the unique facts of Dexter Bush's prosecution, we hold that Bush could be convicted of two counts of witness intimidation.

Issue 2: Whether sufficient evidence supports the felony harassment conviction?

Answer 2: Yes.

Dexter Bush contends that testimony of his threats to kill Fawn is insufficient to support his conviction for felony harassment. He argues that the State did not meet its burden of proving that Fawn reasonably feared that he would execute his threat to kill her. Bush emphasizes Fawn's testimony regarding the threat made by him between June 15, 2010, and August 15, 2010, to someone else in Fawn's presence. Bush maintains that Fawn never said she feared he would carry out this threat, and the statute requires the State to prove that the victim was placed in reasonable fear that the threat made is the one

18

that will be carried out. In other words, Bush argues that the State must prove that Fawn

reasonably feared he would kill her based on the statement of that day alone, without

considering his ongoing pattern of abuse and threats. We disagree.

A sufficiency of the evidence challenge admits the truth of the State's evidence

while allowing all reasonable inferences to be drawn in the State's favor. *State v. Vars*,

157 Wn. App. 482, 496, 237 P.3d 378 (2010). Evidence is sufficient if, after viewing it

in the light most favorable to the State, a rational trier of fact could find each element of

the crime beyond a reasonable doubt. *State v. Green*, 94 Wn.2d 216, 221-22, 616 P.2d

628 (1980).

RCW 9A.46.020, Washington's criminal harassment statute, provides:

> (1) A person is guilty of harassment if:
>     (a) Without lawful authority, the person knowingly threatens:
>     (i) To cause bodily injury immediately or in the future to the person threatened or to any other person . . . and
>     (b) The person by words or *conduct places the person threatened in reasonable fear that the threat will be carried out . . .*
> (2) . . . .
>     (b) A person who harasses another is guilty of a class C felony if . . .
>     (ii) the person harasses another person under subsection (1)(a)(i) of this section by threatening to kill the person threatened or any other person.

(Emphasis added.) In order to convict an individual of felony harassment based on a

threat to kill, RCW 9A.46.020 requires that the State prove that the person threatened was

placed in reasonable fear that the threat to kill would be carried out as an element of the

19

offense. *State v. C.G.*, 150 Wn.2d 604, 612, 80 P.3d 594 (2003). The nature of a threat depends on all the facts and circumstances, and it is not proper to limit the inquiry to a literal translation of the words spoken. *C.G.*, 150 Wn.2d at 611.

Dexter Bush principally relies on *State v. C.G.*, wherein the Supreme Court overturned a student's conviction for felony harassment for threatening to kill her school's vice principal. At trial, the vice principal testified that the threat caused him concern, and based on what he knew about C.G., she might try to harm him or someone else in the future. The court found that these statements did not sufficiently evidence the teacher's immediate fear that C.G. would actually kill him.

We do not find *State v. C.G.* controlling. Viewing the evidence in the light most favorable to the State, a jury could reasonably find, beyond a reasonable doubt, that Fawn Bush reasonably feared Dexter Bush would carry out his threat to kill her. She testified that she took Bush's statement that he "could kill [me], my son, and his wife without batting an eye," as a threat to kill her. RP at 128. Moreover, *C.G.* declares that "the nature of a threat depends on all the facts and circumstances." 150 Wn.2d at 611. In *C.G.*, the only evidence provided by the State was the vice principal's testimony that he was concerned by C.G.'s threat. 150 Wn.2d at 607. In contrast here, Fawn testified that she feared Dexter greatly and believed him capable of making good on his repeated threats to kill her. In addition, a jury could reasonably infer from Fawn's refusal to

20

disclose the abuse to the authorities as evidence of her belief that Bush would carry out his threat to kill her.

The facts on appeal parallel *State v. Mills*, 154 Wn.2d 1, 109 P.3d 415 (2005). There, the Supreme Court affirmed a felony harassment conviction of a woman for leaving an explicit death threat on the phone of her former lover's new girlfriend. In contrasting that case with *C.G.*, the court emphasized that the threat was an explicit threat to kill the new girlfriend, the woman convicted of harassment had also been convicted of assaulting another woman who had dated her former lover, and the new girlfriend testified that she was "very scared" and thought the woman was "capable of doing what she threatened to do." *Mills*, 154 Wn.2d at 12.

Issue 3: Whether sufficient evidence supports the sexual motivation sentencing enhancements for second degree assault and witness intimidation?

Answer 3: Yes.

Dexter Bush contends there is not sufficient evidence to support the sexual motivation sentencing enhancements the jury found applicable to the second degree assault and witness intimidation charges. The State concedes that the conduct in the three counts for which sexual motivation was found does not meet the legal definition of "sexual motivation," and that these three sentencing enhancements should be reversed. We disagree with both parties and affirm the sentence enhancements.

When a defendant is charged with any crime other than a sex offense, the State

may file an allegation that the crime was sexually motivated. RCW 9.94A.835(1).

"Sexual motivation" means that one of the purposes for the crime was the defendant's

sexual gratification. Former RCW 9.94A.030(46) (2010). The State has the burden of

proving sexual motivation beyond a reasonable doubt. RCW 9.94A.835(2). The finding

of sexual motivation must be "based on some conduct forming part of the body of the

underlying felony." In other words, the defendant's sexual motivation must be

"manifested by his or her conduct in the course of committing a felony." *State v.

Halstien*, 122 Wn.2d 109, 120, 857 P.2d 270 (1993) (quoting *State v. Halstien*, 65 Wn.

App. 845, 853, 829 P.2d 1145 (1992)).

A finding of sexual motivation has several consequences. The crime becomes, by

definition, a "sex offense." Former RCW 9.94A.030(45). It is therefore subject to the

special scoring rules applicable to sex offenses. RCW 9.94A.525(17). A finding of

sexual motivation is by itself a sufficient basis for a sentence above the standard range.

RCW 9.94A.535(2)(f). On release, the defendant is required to register as a sex offender.

RCW 9A.44.130. A sexual motivation finding results in specific additions to the

standard sentencing range: 24 months for a class A felony, 18 months for a class B

felony, or 12 months for a class C felony. RCW 9.94A.533(8)(a)(i)-(iii). The

enhancements must be consecutive to all other sentencing provisions, including other

sexual motivation enhancements. RCW 9.94A.533(8)(b). If the offender is sentenced for

more than one offense, the enhancement is added to the total period of confinement for

all the offenses. RCW 9.94A.533(8)(a).

Since Dexter Bush's challenge to the sentencing enhancement asks us to address the sufficiency of the evidence, the challenge admits the truth of the State's evidence while allowing all reasonable inferences to be drawn in the State's favor. *State v. Vars*, 157 Wn. App. 482, 496, 237 P.3d 378 (2010). Fawn testified that Dexter Bush repeatedly, violently raped her, assaulted her, and attempted to control every aspect of her life from the time she turned twelve years old. Fawn testified that the punch from Bush that likely broke her eye socket happened during a time when Bush was angry that Fawn was seeing another man. A jury could reasonably conclude that Bush intended to send a message to Fawn to ignore other men and devote her time to Bush, including time for sex. The first charge of witness intimidation centered around the time of the assault, in August 2010, and entailed Bush threatening to remove Jared from Fawn if she attempted to leave Bush. The jury could conclude that Bush desired his intimidation to tell Fawn that her life would continue under his domination, even though Fawn was seeing a new man. The second instance of witness intimidation, in fall 2010, involved Bush ordering Fawn to engage in sex with her boyfriend in order to conceal Bush's possible paternity of the new child. Bush also threatened to kill Fawn if she did not obey this demand. Concealing the paternity could allow Bush to continue with forced sex with Fawn.

A jury could reasonably conclude that the end result of all actions taken by Dexter Bush was the continuation of the enduring nightmarish, coercive sexual relationship he

maintained with Fawn. Viewing the evidence in the light most favorable to the State, the jury could reasonably infer that the assault and intimidation Bush inflicted on Fawn were for the purpose of continuing the sexual gratification.

Issue 4: Whether the trial court could impose a mental health evaluation as a condition of community custody?

Answer 4: No.

Dexter Bush contends the trial court erred in requiring him to undergo a mental health evaluation as a condition of community custody. He argues that the trial court committed error because it did not enter the statutorily mandated finding that he is a mentally ill person as defined by RCW 71.24.025 (18), and that a qualifying mental illness influenced his crime. The State concedes this assignment of error. We agree the trial court committed error.

An erroneously imposed sentence may be challenged for the first time on appeal. *State v. Bahl*, 164 Wn.2d 739, 744, 193 P.3d 678 (2008); *State v. Ford*, 137 Wn.2d 472, 477, 973 P.2d 452 (1999). We review a crime-related community custody condition for an abuse of discretion. *State v. Brooks*, 142 Wn. App. 842, 850, 176 P.3d 549 (2008).

RCW 9.94B.080 provides:

> The court may order an offender whose sentence includes community placement or community supervision to undergo a mental status evaluation and to participate in available outpatient mental health treatment, *if the court finds that reasonable grounds exist to believe that the offender is a mentally ill person* as defined in RCW 71.24.025, *and that this*

24

> *condition is likely to have influenced the offense.* An order requiring mental status evaluation or treatment *must be based on a presentence report* and, if applicable, mental status evaluations that have been filed with the court to determine the offender's competency or eligibility for a defense of insanity. The court may order additional evaluations at a later date if deemed appropriate.

(Emphasis added.) The trial court must make a specific finding that an offender is a mentally ill person as defined in RCW 71.24.025, and that their condition is likely to have influenced the crime they committed. *See State v. Jones*, 118 Wn. App. 199, 209, 76 P.3d 258 (2003); *State v. Brooks*, 142 Wn. App. at 851-52. Although the presentence hearing report included some evidence that Dexter Bush has mental health issues, the trial court made no oral or written finding that Bush is a mentally ill person as defined by statute, or that the mental health issues noted in the DOC's presentence report influenced any of the offenses for which he was charged.

## CONCLUSION

We affirm Dexter Bush's two convictions for witness intimidation, his conviction for felony harassment, and the sexual motivation sentencing enhancements. We vacate the requirement of a mental health evaluation as a condition of community custody.

A majority of the panel has determined this opinion will not be printed in

25

No. 31894-0-III
*State v. Bush*

the Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Siddoway, C.J.

_____
Lawrence-Berrey, J.

26