IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 40044-1-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CHRISTOPHER QUINTON L. HARRIS, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

COONEY, J. — Christopher Harris was convicted of rape of a child in the first degree and child molestation in the first degree following a jury trial. Mr. Harris appeals, arguing: (1) the two charges were the same in law and fact and, due to the inadequacy of the jury instructions, his right to be free from double jeopardy was violated; (2) the absence of a unanimity instruction or an election from the State as to which act formed the basis for each charge violated his right to a unanimous jury verdict; (3) the trial court erred in denying his motion for a new trial; and (4) certain community custody conditions are unconstitutional or improper and must be struck from the judgment and sentence.

We conclude that: (1) Mr. Harris' right against double jeopardy was not violated;

(2) the State sufficiently elected one instance of rape of a child and failed to clearly elect

the act underlying the conviction for child molestation, but we affirm the conviction as

the error was harmless; (3) the court did not err in denying the motion for a new trial; and

(4) all but one of the challenged community custody conditions are proper.

## BACKGROUND

Mr. Harris was charged with rape of a child in the first degree (rape of a child)

and child molestation in the first degree (child molestation).  The State alleged the acts

supporting the charges occurred between June 1, 2018, and July 30, 2020.  We take the

facts from the trial testimony and from the recorded interviews of M.B.[1] because Mr.

Harris does not challenge the accuracy of the facts on appeal.

April Burbank is the mother of M.B.  M.B. was born on July 29, 2013.  Mr. Harris

was the boyfriend of M.B.'s aunt, Amber Walls.  M.B. met Mr. Harris when she was

approximately six years old.  At the time, M.B. would visit M.B.'s grandparents' home

weekly where she had her own bedroom.  Ms. Walls was not always present with Mr.

Harris when he visited the grandparents' home.  M.B. and Mr. Harris would play games

---

[1] To protect the privacy interests of M.B., we use her initials throughout this opinion.  Gen. Order of Division III, *In re the Matter of Victims*, (Wash. Ct. App. September 22, 2023), https://www.courts.wa.gov/appellate_trial_courts/ ?fa=atc.genorders_orddisp&ordnumber=2023_3&div=III.

in M.B.'s bedroom with the door closed. M.B. claimed that Mr. Harris was sometimes fun to play with, but other times he put his hand down her underwear and touched her "private areas." Rep. of Proc. (RP) (Aug. 24, 2023) at 358. The touching began when M.B. was six years old and occurred each time M.B. visited her grandparents' residence thereafter. M.B. defined her "privates" as being her "vagina" and "butt." RP (Aug. 24, 2023) at 359. M.B. testified that Mr. Harris touched her inappropriately more than five times.

Ms. Burbank shared a recorded conversation with M.B. about Mr. Harris' inappropriate touching with the Ephrata Police Department. Detective Sergeant Troy Froewiss of the Ephrata Police Department reviewed the recording and summarized M.B.'s comments. In part, M.B. stated that Mr. Harris would put his hand in her underwear and told her to "lick his nuts." Clerk's Papers (CP) at 6. M.B. reported the activity occurred at her grandparents' residence.

M.B. was later interviewed at Kid's Hope by Trisha Glenn. Detective Sergeant Froewiss observed the interview from an adjacent room. Detective Sergeant Froewiss reported that M.B. told Ms. Glenn that "[m]y uncle Christopher told me to lick his balls, I didn't want to but he made me," and "[h]e would put his hand down my underwear and scratch my butt," among other statements. CP at 6-7.

After the interview at Kid's Hope, Detective Sergeant Froewiss asked Ms.

Burbank if M.B. knew the names of the intimate parts on her body. Ms. Burbank replied that M.B. did not know the names of the parts or the difference between them. Detective Sergeant Froewiss asked Ms. Burbank the same question with regard to male anatomy. Ms. Burbank said M.B. would not know names for male body parts because they never discussed that with her. M.B.'s parents agreed to submit M.B. to a second interview at Kid's Hope.

On May 18, 2021, M.B. underwent a second interview by Trish Glenn. Prior to the interview, Detective Sergeant Froewiss asked Ms. Burbank if anything new had transpired since the previous interview. Ms. Burbank replied that she had purchased children's books for M.B. that explained the anatomy of boys and girls and that M.B. now understood the difference between a penis and a vagina. Ms. Burbank told Detective Sergeant Froewiss that after giving M.B. the books, M.B. told her, "I thought girls only had butts and boys only had balls, [Mr. Harris] made me lick his penis, not his balls." CP at 7.

Detective Sergeant Froewiss reported that M.B. claimed during that second interview that Mr. Harris "took off his belt," "pulled down his pants," "took his balls out of his pants," and that she "lick[ed] his balls." CP at 8. M.B. stated she did not know of another name for Mr. Harris' "balls." CP at 8. M.B. then described to Ms. Glenn how she licked Mr. Harris' "balls," leaving Detective Sergeant Froewiss "to believe when

4

[M.B.] says balls, she actually means the penis and not the testicles." CP at 9. M.B. reported that her tongue was the only part of her mouth that touched Mr. Harris' balls. M.B. then explained how Mr. Harris would place his hand in her underwear and rub the outside of her vagina with his fingers. M.B. further described incidents of Mr. Harris taking photographs of her "vagina and butt." CP at 10.

In advance of trial, defense investigator LeEllyn Berg interviewed M.B. M.B. stated that she did not know what a penis was during the interview.

Mr. Harris asserted his right to a jury trial. The recording of M.B.'s conversation with Ms. Burbank and both interviews conducted at Kid's Hope were admitted into evidence and played for the jury. During the State's direct examination, M.B. testified that Mr. Harris "took his penis out of his pants" and "told [her] to lick him" while at her grandparents' house. RP (Aug. 24, 2023) at 365. She complied, touching her face to his penis. M.B. explained that she did not have a good understanding of the different female and male body parts at the time of her earlier interviews, but she knew the difference between them as of the date of trial. She clarified at trial that Mr. Harris made her lick his penis.

On cross-examination, defense counsel asked M.B. to "talk about the time when [Mr. Harris] put his hand down your underwear. When that happened, your Nana was in the kitchen making dinner, correct?" RP (Aug. 24, 2023) at 377. M.B. responded,

5

"Correct." RP (Aug. 24, 2023) at 377. Although M.B. testified that Mr. Harris had touched her vagina, M.B. admitted she had earlier stated that Mr. Harris had touched her butt and that her butt was not the same as her vagina.

Mr. Harris testified that on occasion M.B. would grab his hand and take him into her bedroom to play a doll game, Legos, Nerf guns, or a zombie game. Mr. Harris insisted that others had entered the room on occasion while he played with M.B. He also insisted that M.B. expressed happiness when he visited. Mr. Harris denied ever touching M.B.'s private parts, taking pictures of her private parts, or pulling off any of her clothing.

At the conclusion of the evidentiary portion of the trial, the court instructed the jury on the law. The court instructed the jury that to convict Mr. Harris of the crime of rape of a child in the first degree, the jury must find beyond a reasonable doubt "[t]hat between June 1, 2018 and July 30, 2020, [Mr. Harris] had sexual intercourse with [M.B.]," among other elements. CP at 82. The jury was instructed that "sexual intercourse means any act of sexual contact between persons involving the sex organs of one person and the mouth or anus of another." CP at 80.

The court further instructed the jury that to convict Mr. Harris of the crime of child molestation in the first degree, the jury must find beyond a reasonable doubt "[t]hat between June 1, 2018 and July 30, 2020, [Mr. Harris] had sexual contact with [M.B.],"

6

among other elements. CP at 85. The jury was instructed that "[s]exual contact means

any touching of the sexual or other intimate parts of a person done for the purpose of

gratifying sexual desires of either party." CP at 84.

During its closing argument, the State addressed the elements the jury needed to

find in order to convict Mr. Harris of rape of a child:

> Jury Instruction No. 11 gives you the elements. It takes the
> definition and it shows you piece by piece what the state has to prove.
>
> The first element is that between June 1st, 2018 and July 30th, 2020,
> the defendant had sexual intercourse with [M.B.]. Well, what evidence did
> you hear? [M.B.] told you, [M.B.] told the forensic interviewer that the
> defendant made her lick his balls. She told you he made her lick his penis.
> She showed the forensic interviewer how she held it, and that she licked on
> top of it. That is sexual intercourse.
>
> Jury Instruction No. 9 tells you that sexual intercourse means any act
> of sexual contact between a person—between persons involving the sex
> organs of one person and the mouth or anus of another, whether that
> person—whether such persons are of the same or opposite sex. [M.B.]'s
> mouth, specifically her tongue, had contact with Christopher Harris' penis.
> His balls, as she testified to previously, that would still be a sex organ.
> Penis, a sex organ. She told you that many times.
>
> In her forensic interview and on the stand, she told you how old she
> was about when it happened. When she initially told her mom about this,
> that happened on April 29th, 2021. You heard that recording. She told you
> that it didn't happen this year. Well, you also know from many different
> parts of her testimony that [M.B.] hadn't seen Christopher Harris between
> the time that she disclosed all the way back to at least July 4th, 2020.

RP (Aug. 31, 2023) at 767-69. With regard to the child molestation charge, the State

argued:

7

Again, four elements. The first, that between June 1st, 2018 and July 30th, 2020, the defendant had sexual contact with [M.B.]. Everything I just told you about that first element in Jury Instruction 11, it applies to Jury Instruction 14. It's the same.

[M.B.] told you how long it had been happening. That recording with her mom, [M.B.] told her mom on April 29th, 2021, that it had happened for more than a year. She told the same thing to the forensic interviewer twice. And she told the same thing to you.

Element two, that [M.B.] was at least twelve years old—I apologize, I read that wrong. That [M.B.] was less than twelve years old at the time of the sexual contact and was not married to the defendant. Well, she was ten when she came here and testified. She was less than 12 years old.

Sexual contact. You get given that instruction also. Sexual contact is Instruction No. 13. Sexual contact means any touching of the sexual or other intimate parts of a person done for the purposes of gratifying sexual desire of either party.

[M.B.] told you where he touched her. He used his fingers. He touched her butt. He touched her vagina. She may call them different names now than she did when she was seven, but she told you what he did. When she was seven, she described it as scratching. He was scratching her butt, scratching her vagina. Last week she told you that he was rubbing. He was moving his fingers around. And she clarified it was her vagina.

April told you that for a long time [M.B.] referred to every part of herself as—her intimate parts as her butt. She was seven. It wasn't until after this came out that April decided it was time to sit down and teach body parts. She was only seven, after all.

She also considered every part of male genitalia balls. April told you that. Again, she had to sit down and explain it to her seven year old. Try to explain it.

RP (Aug. 31, 2023) at 769-71. The prosecution commented to the jury that Mr. Harris

8

had placed his hands inside M.B.'s underwear and rubbed her vagina at least five times.

The jury ultimately found Mr. Harris guilty of rape of a child in the first degree and child molestation in the first degree. He was later sentenced to 145 months to life in confinement. The court imposed various community custody conditions which included:

> (a) Mandatory Conditions: Defendant shall comply with the following conditions during the term of community placement/custody:
>
> . . . .
>
> (3) Not consume controlled substances except pursuant to lawfully issued prescriptions;
>
> . . . .
>
> (8) Remain within geographic boundary, as set forth in writing by the Community Corrections Officer.(b) Other Conditions: Defendant shall comply with the following other conditions during the term of community placement/custody:
>
> . . . .
>
> 10. Shall not have contact with minor females under the age of 18 ulness [sic] in the company of a responsible adult sponor [sic] approved by the sex offender treatment provider and Community Corrections Officer (COO).
>
> 11. Hold no position of trust or authority involving minor children.
>
> 12. The defendant shall obtain a mental health evaluation and successfully complete any recommended treatment/counseling program. The defendant shall also take any mental health medication(s) as prescribed.
>
> . . . .

15. The defendant shall submit to polygraph examinations and urinalysis testing to monitor compliance of conditions of supervision as directed by the CCO.

CP at 136 (emphasis omitted).

Mr. Harris timely appeals.

ANALYSIS

DOUBLE JEOPARDY

Mr. Harris claims that the trial court's failure to instruct the jury that in order to convict him of child molestation, it needed to find an act separate and distinct from the act relied on to convict him of rape of a child. Specifically, Mr. Harris argues Washington law permits convictions for both child molestation and rape of a child based on M.B. putting her mouth to his penis. Therefore, the two offenses are the same in fact and law, resulting in a double jeopardy violation. The State responds that the crimes are not the same because each contains an element absent from the other. We agree with the State.

This court reviews double jeopardy claims de novo. *State v. Smith*, 177 Wn.2d 533, 545, 303 P.3d 1047 (2013). Under both the United States Constitution and the Washington State Constitution, individuals have a right to be free from double jeopardy. *State v. Hancock*, 17 Wn. App. 2d 113, 117, 484 P.3d 514 (2021); *State v. Heaven*, 127 Wn. App. 156, 161, 110 P.3d 835 (2005); U.S. CONST. amends. V, XIV; WASH. CONST.

art. I, § 9. "The state and federal double jeopardy clauses offer the same scope of protection." *Heaven*, 127 Wn. App. at 161. One component of protection is "the right not to be punished multiple times for the same offense." *Hancock*, 17 Wn. App. 2d at 117. "A double jeopardy claim is of constitutional proportions and may be raised for the first time on appeal." *State v. Land*, 172 Wn. App. 593, 598, 295 P.3d 782 (2013).

The right to be free from multiple punishments is a unique constitutional right in that "[t]he State has broad authority to extract multiple punishments for the same conduct." *Hancock*, 17 Wn. App. 2d at 117. A double jeopardy violation does not occur if multiple punishments of the same conduct are consistent with legislative intent. *Id*. This court examines the language of applicable statutes to determine whether the legislature intended to authorize multiple punishments for the same conduct. *State v. Wilkins*, 200 Wn. App. 794, 806, 403 P.3d 890 (2017).

"If the statutes do not expressly allow for multiple convictions arising from the same act, we next determine whether two statutory offenses are the same in law and in fact." *Id.* "Two offenses are not the same when 'there is an element in each offense which is not included in the other, and proof of one offense would not necessarily also prove the other.'" *Land*, 172 Wn. App. at 599 (quoting *State v. Vladovic*, 99 Wn.2d 413, 423, 662 P.2d 853 (1983)).

Washington's rape of a child statute provides:

11

A person is guilty of rape of a child in the first degree when the person has sexual intercourse with another who is less than twelve years old and the perpetrator is at least twenty-four months older than the victim.

RCW 9A.44.073(1). In part, "sexual intercourse" occurs

. . . upon any penetration, however slight and . . . (c) any act of sexual contact between persons involving the sex organs of one person and the mouth or anus of another whether such persons are of the same or opposite sex.

RCW 9A.44.010(14). Washington's statute for child molestation in the first degree, states:

A person is guilty of child molestation in the first degree when the person has, or knowingly causes another person under the age of eighteen to have, sexual contact with another who is less than twelve years old and the perpetrator is at least thirty-six months older than the victim.

RCW 9A.44.083(1). "Sexual contact" is defined as

. . . any touching of the sexual or other intimate parts of a person done for the purpose of gratifying sexual desire of either party or a third party.

RCW 9A.44.010(13).

Although there are similarities between the statutes, rape of a child and child molestation differ. Rape of a child involves some form of penetration while child molestation involves sexual contact, meaning some form of sexual gratification from the contact. Although penetration may certainly be characterized as sexual contact, unlike

child molestation, rape of a child need not be done for the purpose of gratifying the sexual desires of either party. Because the element of sexual gratification is absent from the elements of rape of a child, the two charges are not the same in law.

In *Land*, Division One of this court held the two statutes "are the same *in fact and in law* because all the elements of the rape as proved are included in molestation, and the evidence required to support the conviction for molestation also necessarily proves the rape." 172 Wn. App. at 600. As discussed below, regardless of our disagreement with Division One's holding in *Land*, Mr. Harris' double jeopardy argument still fails as the two offenses are also not the same in fact.

The only evidence of sexual intercourse supporting Mr. Harris' conviction for rape of a child is that he made M.B. lick his penis. The State emphasized to the jury that it relied on that act to support a conviction for rape of a child. Albeit the State neglected to make a sufficient election as to the crime of child molestation, the State made clear to the jury that it only relied on the act of Mr. Harris placing his hand in M.B.'s underwear and touching her vagina to support a conviction of the charge. Therefore, the two offenses are not the same in fact. They do not arise out of the same act, and the evidence required to support Mr. Harris' conviction for child molestation does not necessarily prove rape of a child.

The charges of rape of a child and child molestation are not the same in law and, based on the evidence before us, are not the same in fact. Mr. Harris' right to not be punished multiple times for the same offense was not violated.

JURY UNANIMITY

Mr. Harris argues his constitutional right to a unanimous jury verdict was violated because the trial court failed to provide the jury with a unanimity instruction and the State failed to elect which acts formed the basis for each of the charges. In regard to the rape of a child charge, the State responds it made a sufficient election when it told the jury during summation that it was relying on the act of M.B. licking Mr. Harris' penis to support that charge. We agree with the State. In regard to the child molestation charge, the State acknowledges it presented evidence of multiple instances of Mr. Harris touching M.B.'s vagina, and that it failed to identify the instance on which it relied to support a conviction. Nevertheless, the State argues that its failure to elect one instance is harmless. We agree the State failed to elect an act but find any error was harmless.

We review the question of jury unanimity de novo as it implicates constitutional due process rights under a challenged jury instruction. *In re Pers. Restraint of Mulamba*, 199 Wn.2d 488, 507, 508 P.3d 645 (2022).

Article I, section 21 of the Washington State Constitution guarantees criminal defendants the right to a unanimous jury verdict at trial. *State v. Joseph*, 3 Wn. App. 2d

14

365, 369, 416 P.3d 738 (2018); *State v. Sandholm*, 184 Wn.2d 726, 732, 364 P.3d 87 (2015). In multiple acts cases, "the jury must unanimously agree as to which incident constituted the crime charged" and find the crime occurred beyond a reasonable doubt. *State v. Bobenhouse*, 166 Wn.2d 881, 893, 214 P.3d 907 (2009). When the prosecution presents evidence of multiple acts of similar misconduct, any one of which could form the basis of a charged count, either the State must elect which such act is being relied on for a conviction or the court must instruct the jury to agree on a specific criminal act. *State v. Petrich*, 101 Wn.2d 566, 572, 683 P.2d 173 (1984), *abrogated by State v. Kitchen*, 110 Wn.2d 403, 756 P.2d 105 (1998); *State v. Coleman*, 159 Wn.2d 509, 511, 150 P.3d 1126 (2007). Provided the election clearly identifies the particular act on which charges are based, telling the jury of the election during closing argument suffices. *State v. Smith*, 17 Wn. App. 2d 146, 159, 484 P.3d 550 (2021). The sufficiency of the State's election is based on the specific facts of each case. *Id.*

### Rape of a Child in the First Degree

Mr. Harris asserts that the State presented multiple acts of rape of a child that required either a jury unanimity instruction or a precise election by the State of the facts supporting Mr. Harris' guilt. Specifically, Mr. Harris claims that M.B. described two distinct acts: licking Mr. Harris' "balls" and licking his penis. We disagree.

During its closing argument, the State adopted the licking of the testicles and the

15

licking of the penis as the single act forming the crime of rape of a child. The State, during closing, referenced M.B. telling the interviewer that Mr. Harris made her lick his "balls," but further argued that M.B. testified that Mr. Harris made her lick his penis. The evidence confirmed that, at the time of M.B.'s interviews, she did not know the difference between a man's penis and "balls." M.B. averred at trial that she now knew the difference and stated that Mr. Harris made her lick his penis. The evidence supports the State's contention for a single act of M.B. licking Mr. Harris' genitalia.

In his reply brief, Mr. Harris mentions that the State asserted that M.B. testified "it happened a lot" during its summation. RP (Aug. 31, 2023) at 768. Nevertheless, Mr. Harris does not expressly argue that the State presented testimony of multiple acts of rape of a child except for the distinction between the licking of Mr. Harris' "balls" and his penis. Nor does Mr. Harris cite to portions of the record confirming testimony of multiple acts of rape of a child.

The State made a sufficient election of the act it was relying on to support a conviction for rape of a child in the first degree.

### *Child Molestation in the First Degree*

During summation, the State mentioned Mr. Harris' ongoing sexual molestation of M.B. The prosecution argued:

> [M.B.] told you how long it had been happening. That recording with

16

her mom, [M.B.] told her mom on April 29th, 2021, that it had happened
for more than a year. She told the same thing to the forensic interviewer
twice. And she told the same thing to you.

RP (Aug. 31, 2023) at 769. Based on these comments, the State argues it elected the act

on which it sought to convict Mr. Harris of child molestation. The comments, however,

referenced only the type of molestation that occurred: the touching of M.B.'s vagina.

Consistent with M.B.'s testimony, the State asserted during summation that Mr. Harris

rubbed M.B.'s vagina at least five times. The State provided few details of those

respective times. Ultimately, despite its election of the character of the molestation, the

State concedes it submitted evidence of multiple acts without electing a specific act.

Nevertheless, the State asserts the error was harmless.

The failure of the State to make a clear election or provide a unanimity instruction

in multiple acts cases constitutes constitutional error. *Bobenhouse*, 166 Wn.2d at 893.

When constitutional error occurs during a trial, we will affirm the jury verdict only if that

error was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24,

87 S. Ct. 824, 17 L. Ed. 2d 705 (1967); *State v. Camarillo*, 115 Wn.2d 60, 65, 794 P.2d

850 (1990), *abrogated on other grounds by State v. Crossguns*, 199 Wn.2d 282, 505 P.3d

529 (2022). The harmless error rule preserves an accused's right to a fair trial without

sacrificing judicial economy in the inevitable presence of immaterial error. *Delaware v.*

*Van Arsdall*, 475 U.S. 673, 680-82, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986); *State v.*

17

*Kitchen*, 110 Wn.2d 403, 409, 756 P.2d 105 (1988).

The reviewing court presumes the error prejudiced the accused. *Camarillo*, 115 Wn.2d at 65. In the unique setting of jury unanimity, the State may overcome the presumption only if no rational juror could have a reasonable doubt as to the occurrence of any of the incidents alleged. *Id.* There is no possibility of harmless error when separate instances of conduct are admitted into evidence to support a single charge, and when conflicting testimony could lead a reasonable juror to doubt whether one or more incidents actually occurred. *Id*. However, if the evidence of separate instances of conduct is uncontroverted, a unanimity instruction is not required. *Coleman*, 159 Wn.2d at 514.

M.B. testified that Mr. Harris repeatedly put his hand in her underwear and touched her vagina or buttocks. Other than the purported difference between M.B. claiming she licked Mr. Harris' testicles and penis, Mr. Harris did little to impeach the testimony of M.B. Rather, Mr. Harris generally denied the conduct.

Because no conflicting evidence existed regarding any act of child molestation, the absence of a unanimity instruction or election of a single act by the State was harmless beyond a reasonable doubt. Based on the uncontroverted evidence, no rational basis existed for the jurors to distinguish among the acts described. *See Camarillo*, 115 Wn.2d 60; *State v. Loehner*, 42 Wn. App. 408, 711 P.2d 377 (1985); *State v. Allen*, 57 Wn. App.

134, 788 P.2d 1084 (1990).

Mr. Harris next argues that the jury might have convicted him of child molestation for the act of M.B. licking his penis because of the lack of an election by the State. We disagree.

M.B. testified to only one occurrence of licking Mr. Harris' genitalia. During a forensic interview, M.B. described the area as Mr. Harris' "balls." During trial, she described the anatomical region as Mr. Harris' penis. The State reasonably explained the discrepancy arising from a young girl's lack of familiarity with the male anatomy. Based on the evidence, all reasonable jurors would conclude that M.B. licked Mr. Harris' penis, and not his "balls," on only one occasion. The State elected this event as the act for the crime of child molestation in the first degree.

MOTION FOR A NEW TRIAL

Mr. Harris filed a motion for a new trial grounded on the purported jury unanimity error. On appeal, Mr. Harris argues that the trial court erred in denying his motion for a new trial. We review a trial court's denial of a motion for a new trial for an abuse of discretion. *State v. Allen*, 159 Wn.2d 1, 10, 147 P.3d 581 (2006). Although a jury unanimity error exists as to the child molestation charge, this error was harmless. Therefore, the trial court did not abuse its discretion in denying Mr. Harris' motion for a new trial.

19

COMMUNITY CUSTODY CONDITIONS

Mr. Harris challenges five community custody conditions imposed by the trial court.

This court reviews de novo a trial court's statutory authority to impose a certain community custody condition. *State v. Houck*, 9 Wn. App. 2d 636, 646, 446 P.3d 646 (2019). Only if the trial court had statutory authority to impose the community custody condition will this court review the trial court's decision to impose a condition for an abuse of discretion. *State v. Johnson*, 180 Wn. App. 318, 326, 327 P.3d 704 (2014). Challenges to community custody conditions may be brought for the first time on appeal. *State v. Wallmuller*, 194 Wn.2d 234, 238, 449 P.3d 619 (2019).

*Geographic Limitations (Condition (a)(8))*

Community custody condition (a)(8) requires Mr. Harris "[r]emain within geographic boundary, as set forth in writing by the Community Corrections Officer." CP at 168. Mr. Harris challenges this condition as being unconstitutionally vague in that it fails to give him a fair warning of the conduct forbidden and lacks ascertainable standards to protect against arbitrary enforcement by the officer. The State first conceded this assignment of error before later encouraging us to follow the holding in *State v. Lundstrom*, 34 Wn. App. 2d 977, 572 P.3d 1243 (2025).

Under the due process clause of the Fourteenth Amendment to the United States

Constitution and article I, section 3 of the Washington Constitution, a community custody

condition is unconstitutionally vague "'if (1) it does not sufficiently define the proscribed

conduct so an ordinary person can understand the prohibition or (2) it does not provide

sufficiently ascertainable standards to protect against arbitrary

enforcement.'" *Wallmuller*, 194 Wn.2d at 238-39 (quoting *State v. Padilla*, 190 Wn.2d

672, 677, 416 P.3d 712 (2018)). "'[A] community custody condition "is not

unconstitutionally vague merely because a person cannot predict with complete certainty

the exact point at which [their] actions would be classified as prohibited

conduct."'" *State v. Valencia*, 169 Wn.2d 782, 793, 239 P.3d 1059 (2010) (quoting *State

v. Valencia*, 148 Wn. App. 302, 321, 198 P.3d 1065 (2009), *rev'd*, 169 Wn.2d 782).

The Washington State Supreme Court held that "[w]hile the right to travel is

recognized as a fundamental right of citizenship, this right is affected by a criminal

conviction." *In re Pers. Restraint of Winton*, 196 Wn.2d 270, 274, 474 P.3d 532 (2020).

Infringement on an offender's right to travel is authorized while the offender is serving

community custody. *Id.* at 275.

Recently, in *State v. Lundstrom*, Division One of this court held that a similar

geographic limitation was not unconstitutionally vague. The court in *Lundstrom* noted

that the condition was authorized under RCW 9.94A.703(1)(b), (3)(a), and RCW

9.94A.704(3)(b).  34 Wn. App. 2d at 980.  RCW 9.94A.703(3)(a) authorizes the trial

court to order an offender to "[r]emain within, or outside of, a specified geographical

boundary."  Similarly, RCW 9.94A.704(3)(b) states when the Department of Corrections

(DOC) supervises an offender, "the department shall at a minimum instruct the offender

to . . . [r]emain within prescribed geographical boundaries."  A person of ordinary

intelligence is capable of understanding what the condition proscribes.

　　　　The *Lundstrom* court further noted that the community corrections officer's

authority to impose conditions is limited and must be "'reasonably related to . . . [t]he

crime of conviction, the offender's risk of reoffending, or the safety of the community.'"

*Id*. at 981 (quoting RCW 9.94A.704(7)(b)).  If an offender believes a geographic

restriction is not related to one of these categories, the offender has the option of pursuing

administrative review.  *Id.*

　　　　We follow the reasoning in *Lundstrom*.  The condition mandating that Mr. Harris

remain within a geographic boundary prescribed by his community corrections officer is

not unconstitutionally vague because the statutes authorize the DOC to set geographic

boundaries and because such restrictions are limited in application and subject to review.

*Contact with Underage Females (Condition (b)(10) & (11))*

　　　　Mr. Harris argues that the community custody condition requiring him to "not

have contact with minor females under the age of 18 ulness [sic] in the company of a

22

responsible adult sponor [sic] approved by the sex offender treatment provider and Community Corrections Officer" and to "[h]old no position of trust or authority involving minor children" violates his right to parent prospective children. CP at 168. Mr. Harris claims the sentencing court erred by failing to conduct the requisite analysis on the record before imposing these community custody conditions. We decline review of these challenged conditions as they are not ripe.

In determining whether a preenforcement challenge to a community custody condition is ripe for review, we determine whether "'the issues raised are primarily legal, do not require further factual development, and the challenged action is final.'" *Valencia*, 169 Wn.2d at 786 (quoting *State v. Bahl*, 164 Wn.2d 739, 751, 193 P.3d 678 (2008)). We also consider the hardship to the defendant if the challenged condition is not reviewed on appeal. *State v. Cates*, 183 Wn.2d 531, 534, 354 P.3d 832 (2015).

While the challenged action is final and the claim raises primarily legal issues, it requires further factual development because Mr. Harris does not presently have biological children nor is there evidence he is expecting a child. ("Mr. Harris would also like to be a father one day, but only if he found the right life partner." CP at 106.). Furthermore, any hardship Mr. Harris may face is insufficient to justify review because there is currently no parent-child relationship that could be affected by the conditions,

23

and Mr. Harris may seek modification of the condition via the mechanism provided in

RCW 9.94A.709(2)(a) if he does have a child while on community custody.

Because Mr. Harris' challenge to conditions (b)(10) and (11) is not ripe, we

decline review.

*Mental Health Evaluation (Condition (b)(12))*

Mr. Harris argues that the trial court's failure to find that he suffers from a

statutorily defined mental illness that contributed to the offenses bars imposition of the

community custody condition requiring a mental health evaluation and successful

completion of any recommended treatment and counseling. The State concedes this

assignment of error.

RCW 9.94B.080 states:

> The court may order an offender whose sentence includes community
> placement or community supervision to undergo a mental status evaluation
> and to participate in available outpatient mental health treatment, if the
> court finds that reasonable grounds exist to believe that the offender is a
> mentally ill person as defined in RCW 71.24.025, and that this condition is
> likely to have influenced the offense. An order requiring mental status
> evaluation or treatment may be based on a presentence report and, if
> applicable, mental status evaluations that have been filed with the court to
> determine the offender's competency or eligibility for a defense of insanity.

RCW 71.24.025(43) defines "mentally ill persons" as "persons and conditions defined in

24

subsections (3), (13), (52), and (53)[2]" of the statute. The trial court was not presented

with evidence that Mr. Harris had a mental illness nor did it make any such findings.

Citing *State v. Shelton*, 194 Wn. App. 660, 378 P.3d 230 (2016), the State argues

that this court should remand for the sentencing court to assess whether Mr. Harris has a

mental illness rather than strike the community custody condition. In *Shelton*, the court

imposed a community custody condition requiring that the defendant undergo a mental

health evaluation. 194 Wn. App. at 850-51. The trial court found that mental health

issues contributed to the offense but did not enter a finding that the defendant was a

mentally ill person as defined by the statute. *Id*. at 852. This court remanded the matter

for the trial court to determine whether to order a mental health evaluation under the

requirements of the statute. *Id*. at 851-52.

Unlike the facts in *Shelton*, here, the sentencing court did not find that Mr. Harris'

mental health issues contributed to the offenses. The court also failed to find Mr. Harris

is mentally ill as defined by RCW 71.24.025.

The facts before us are akin to those in *State v. Brooks*, 142 Wn. App. 842, 176

P.3d 549 (2008). In *Brooks*, this court addressed whether the trial court exceeded its

authority in imposing a community custody condition requiring that the defendant

---

[2] Subsection (53) lists a "severely emotionally disturbed child." Mr. Harris is not a child.

undergo a mental health evaluation when the court did not find the defendant to be a mentally ill person whose condition influenced the offense. This court reversed the community custody condition on that ground. It did not remand the case for the trial court to conduct the requisite analysis on the record.

Like the court in *Brooks*, here, the sentencing court did not enter any findings necessary to impose a community custody condition requiring a mental health evaluation. Accordingly, we remand for the trial court to strike community custody condition (b)(12).

*Polygraph Evaluation and Urinalysis (Condition (b)(15))*

Mr. Harris argues that the community custody condition requiring that he submit to polygraph examinations and urinalysis testing unconstitutionally invades his right to privacy because his convictions do not involve drug use. When analyzing this argument, we note that Mr. Harris does not challenge community custody condition (a)(3) that prohibits him from consuming controlled substances except pursuant to lawfully issued prescriptions. Community custody condition (b)(15) was imposed to monitor compliance with condition (a)(3).

In support of his argument, Mr. Harris relies on *State v. Olsen*, 189 Wn.2d 118, 399 P.3d 1141 (2017). We conclude, however, that *Olsen* harms Mr. Harris' contention. Under *Olsen*, the court may order otherwise invalid conditions if imposed to monitor compliance with valid probation conditions. *Id.* at 134. Here, the sentencing court

26

No. 40044-1-III
*State v. Harris*

ordered the challenged condition to monitor Mr. Harris' compliance with a permissible condition. Thus, we affirm the trial court's imposition of community custody condition (b)(15).

CONCLUSION

We affirm Mr. Harris' convictions for rape of a child in the first degree and child molestation in the first degree. We affirm the trial court's imposition of community custody conditions (a)(8) and (b)(12) and decline review of conditions (b)(10) and (b)(11). Lastly, we remand to the trial court to strike community custody condition (b)(12) from Appendix H to the judgment and sentence.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Cooney, J.

I CONCUR:

_____
Staab, A.C.J.

27

No. 40044-1-III

FEARING, J. — (dissent/concurrence) I dissent from the majority's affirmation of the community custody condition that imposes geographic limitations on Christopher Harris. I agree with the majority's ruling regarding harmless error in the context of the failure to give a jury unanimity instruction but write separately to criticize the rule that the majority must follow.

*Geographic Limitations*

Community custody condition (a)(8) demands that Christopher Harris remain within a geographic boundary as placed in writing by the community custody officer. Harris challenges this condition as being unconstitutionally vague in that it fails to give him a fair warning of the forbidden conduct and lacks ascertainable standards to protect against arbitrary enforcement by the officer. The State concedes this assignment of error. I agree with the State and Christopher Harris.

RCW 9.94A.703 empowers the sentencing court to impose geographic boundaries, in which the offender must stay put. In the alternative, RCW 9.94A.704(3)(b) authorizes the Department of Corrections (DOC) to instruct the offender to "remain within prescribed geographic boundaries." Christopher Harris's sentencing court directed the DOC community custody officer to establish the confined borders.

A condition of community custody is unconstitutionally vague if it either fails to give fair warning of the forbidden conduct or fails to set ascertainable standards that will prevent arbitrary enforcement. *State v. Johnson*, 197 Wn.2d 740, 747, 487 P.3d 893

(2021); *State v. Padilla*, 190 Wn.2d 672, 677, 416 P.3d 712 (2018). The majority focuses on whether an ordinary person can understand the import of community custody condition 8. But this appeal involves the potential for arbitrary enforcement of the community custody condition.

Community custody condition 8 demands that Christopher Harris remain in a geographic boundary established by his community custody officer. The condition bestows the officer unrestrained authority. The officer could permit Harris to travel anywhere within the Milky Way galaxy or to constrict Harris within a one square city block. The officer could bidaily modify the circumscribed quarters depending on his or her changing gastronomy.

The majority and another division writing in *State v. Lundstrom*, 34 Wn. App. 2d 977, 572 P.3d 1243 (2025) justify the violation of Christopher Harris's due process rights by citing RCW 9.94A.704(7)(b). This statutory subsection demands that the community custody officer impose only conditions "reasonably related to . . . [t]he crime of conviction, the offender's risk of reoffending, or the safety of the community." RCW 9.94A.704(7)(b). We know now that any geographic travel restriction meets none of these three criteria. Another community custody condition already restrains him from contact with the victim and other females under the age of 18. DOC should restrict Harris from young females not from geographic areas.

2

The majority and a sibling division, writing in *State v. Lundstrom*, 34 Wn. App. 2d 977 (2025) also excuse the due process violation when commenting that Christopher Harris may challenge, according to RCW 9.94A.704(7)(b), the geographical limitation after the community custody officer establishes the demarcations. We do not know how long this challenge will take, but Harris' liberty to travel will be restricted in the meantime. Regardless, the availability of post-deprivation procedures does not necessarily satisfy due process dictates. *Rivera-Powell v. New York City Board of Elections*, 470 F.3d 458, 465 (2d Cir. 2006). Only when the State cannot anticipate and prevent a random deprivation of a liberty interest may post-deprivation remedies satisfy due process. *Zinermon v. Burch*, 494 U.S. 113, 132, 110 S. Ct. 975, 108 L. Ed. 2d 100 (1990). DOC knows in advance that its community custody officer possessing discretion to ascertain geographic boundaries violates constitutional standards. In fact, the State has conceded the unconstitutionality of the community custody condition.

### *Jury Unanimity*

I disagree with the Supreme Court's and this court's jurisprudence on harmless error in the context of jury unanimity. Delivering a jury unanimity instruction imposes little burden on the trial court. Electing one of many acts to constitute the charged crime places no onus on the State. One wonders if the State omits a jury unanimity instruction or fails to elect one act to sometimes benefit from confusion of the jury.

3

40044-1-III
*State v. Harris* (dissent/concurrence)


Washington jurisprudence emphasizes the accused's general denial, rather than the accused's detailed recitation of facts contradicting the victim's testimony, as a factor in favor of finding harmless error. Nevertheless, when the victim fails to provide dates and times, the accused encounters difficulties providing alibis.

I question the validity of deciding harmless error based on whether the jury purportedly believed the victim but not the accused. As a substitute trial court judge, I have presided over trials during which the jury agrees with the victim as to one or more counts but not all counts. I could not discern why. Even when the jury deems the victim more credible than the accused, the jury could conclude the State did not introduce sufficient evidence to convict of one or more charges beyond a reasonable doubt.

I am bound by Washington Supreme Court precedent even if I disagree with its tenuous reasoning. *State v. Gore*, 101 Wn.2d 481, 487, 681 P.2d 227 (1984).


Fearing, J.